F7RAROM1ps

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    CARMELO ROMERO and JUAN ROMERO,
      individually and on behalf of
 4    others similarly situated,

 5                    Plaintiffs,

 6            v.                              14-cv-457 (AT)

 7    ANJDEV ENTERPRISES, INC.
      (d/b/a AMMA), ANJU SHARMA,
 8    and DEVENDRA SHARMA,

 9                    Defendants.

10    ------------------------------x

11                                        New York, N.Y.
                                          July 27, 2015
12                                        9:05 a.m.

13
      Before:
14
                        HON. ANALISA TORRES
15
                                          District Judge
16

17                      APPEARANCES

18    MICHAEL FAILLACE & ASSOCIATES, P.C.
              Attorneys for Plaintiffs
19    BY:   JOSHUA S. ANDROPHY, ESQ.
              SHAWN R. CLARK, ESQ.
20
      THE ANTONIOUS LAW FIRM
21          Attorneys for Defendants
      BY:   JACQUELINE S. KAFEDJIAN, ESQ.
22

23    Also Present:  Nicholas Luttinger
                     Carmen Barros
24                   Spanish Interpreters

25
```

F7RAROM1ps                    Opening – Mr. Androphy

1          (In open court)

2          THE COURT:  Good morning.  Would you make your

3     appearances, please.

4          MR. ANDROPHY:  Joshua Androphy, of Michael Faillace &

5     Associates, for the plaintiffs.

6          MS. KAFEDJIAN:  Jacqueline Kafedjian.

7          MR. CLARK:  And Shawn Clark from Michael Faillace &

8     Associates for the plaintiffs, your Honor.

9          MS. KAFEDJIAN:  Jacqueline Kafedjian, the Antonious

10    Law Firm, for the defendants.

11          THE COURT:  We will start with the opening statement

12    of the plaintiff.

13          MR. ANDROPHY:  Good morning, your Honor.

14          The evidence at trial today and tomorrow will show

15    that the defendants clearly violated the overtime laws of the

16    FLSA and the New York Labor Law in the way that they paid the

17    plaintiffs Juan Romero and Carmelo Romero.

18          The evidence will clearly show that the plaintiffs

19    were always paid a fixed salary, fixed daily rate.  It never

20    varied based on changes in the number of hours they worked on a

21    day-to-day basis, and the number of hours that the plaintiffs

22    worked on a day-to-day basis did in fact vary.  The only time

23    that the pay varied is if the plaintiffs worked one additional

24    day in a week or one fewer day than they usually worked.  Both

25    plaintiffs, their normal schedule, they worked six days per

F7RAROM1ps                    Opening - Mr. Androphy

week.  They worked seven, they would be proportionally

increased.  If they worked five days, their pay would be

proportionally decreased.  But the evidence will show that this

pay was not based on any hourly rate that was being paid and

then with an overtime premium for hours worked above 40 as the

law requires.  Instead, they were just paid a flat daily

salary.  Even when -- you can see this even when their number

of days worked in the week did change.  For example, if a

plaintiff was earning $450 per week for a six-day week, if in a

given week they worked seven days they would receive $525 for

the week, which is exactly the $75-per-day rate that they were

being paid.

        That's not consistent with being paid any overtime.

If they worked a seven-day week, we were clearly working, I

think everyone agrees, more than 40 hours in the week, and yet

this additional day was resulting in pay increasing at the

exact rate of $75 a day, to take one example.

        The plaintiffs generally worked, they started their

workday at or around 11 a.m.  That is not really disputed.

What is disputed is the time that their workday ended.

Plaintiffs will testify, as they put forward in their trial

declarations, that they usually finished work and left the

restaurant around 11:30 at night, sometimes at midnight,

sometimes occasionally even later when they had to stay for

extra cleaning.

1          Now, there were at some time records of when the

2     plaintiffs stopped working.  For part of their employment, the

3     plaintiffs would clock in and clock out when they started and

4     when they finished every day.  But yet those records are no

5     longer here.  They disappeared.  And the defendants have not

6     been clear when those computer records exactly disappeared, the

7     records that would show the time that the plaintiffs left.  And

8     those are the only records that ever existed that would show

9     the time that the plaintiffs left for work.

10          So based on the evidence that will be put forward at

11     trial, there is a clear right to recover for overtime based on

12     the fact that the plaintiffs were paid flat weekly salaries

13     that did not vary based on the number of hours each week.

14          Now, if this is proven, then the issue of whether the

15     plaintiffs were entitled to be paid at the tip credit rate

16     isn't even really relevant, because if they were simply paid a

17     flat salary, it's clear that they're entitled to overtime pay.

18     But the defendants, they seem to be arguing that the plaintiffs

19     were in fact paid at an hourly rate and that they were paid at

20     a tip credit rate of $5 per hour during their employment.  And

21     if this issue is in fact reached, it will be clear that the way

22     that the plaintiffs were paid, even if the Court accepts the

23     defendants' contention that the plaintiffs received $5 per

24     hour, that was not lawful.  Plaintiffs were not given notice,

25     as is required under the FLSA and New York Labor Law, that

F7RAROM1ps                    Opening - Mr. Androphy

 1   their salary would be reduced from the regular minimum wage due

 2   to the tips they were receiving.  Plaintiffs performed a lot of

 3   their time doing work like cleaning both in the restaurant,

 4   even across the street at offices used by the owners of the

 5   restaurant.  All of this work that they did doing non-delivery

 6   work exceeded 20 percent of their time, and that too made it

 7   unlawful for them to be paid at the tip credit rate.

 8           Moreover, even according to the defendants, the

 9   plaintiffs were paid at the rate of $5 per hour.  That was not

10   the legal rate for much of the time that the plaintiffs worked

11   for delivery workers to be paid.  The New York regulations that

12   went into effect in 2011 stated that the legal rate for

13   delivery workers who were being paid at the tip credit rate, if

14   everything is done correctly, is $5.65 per hour.

15           Additionally, the plaintiffs will testify through

16   their declarations that the defendants regularly did not give

17   them all their tips, in particular that the defendants held on

18   to all the tips that were received through Internet orders like

19   Seamless web.  So even if the Court does not accept that the

20   plaintiffs were paid at a weekly rate and that that was

21   unlawful, the plaintiffs should prevail based on the fact that

22   it was not lawful to pay them at the tip credit rate and they

23   were not in fact paid at the tip credit rate.

24           In addition, the plaintiffs also were not paid

25   spread-of-hours pay for the days that they worked more than ten

F7RAROM1ps                    Opening - Ms. Kafedjian

1    hours a day, which was most days, or every day that they

2    worked.  They had to purchase equipment, such as bicycles, that

3    were necessary for their deliveries, for their work as

4    deliverymen, with their own funds.  They were not reimbursed.

5    That is and additional claim that the plaintiffs are putting

6    forward today.

7          Finally, they were not given wage statements as the

8    law requires.  Specifically the New York law requires that they

9    be provided wage statements each week, together with their

10   weekly wages.  Instead they were just given cash payments with

11   no record that they could keep.

12         And finally, they were not given a wage notice when

13   their rate of pay changed or when they started work or at the

14   beginning of each year, as is required by New York law.

15         Based on the foregoing and the evidence that we

16   presented at trial, the plaintiffs are entitled to recovery of

17   damages, including liquidated damages and attorney's fees.

18         Thank you, your Honor.

19         THE COURT:  Thank you.

20         You may make your opening statement.

21         MS. KAFEDJIAN:  Good morning.  This is a case of two

22   sides telling vastly different narratives about the employment

23   of plaintiffs as delivery workers in the defendants'

24   restaurant.  Therefore, the credibility of the testimony during

25   the trial will be critical in this case.  Defendants will prove

F7RAROM1ps                    Opening - Ms. Kafedjian

1    that all the plaintiffs were being paid by the hour and that

2    they were compensated at varying rates for regular hours, for

3    overtime hours, and for the spread-of-hours pay.

4         The records in evidence include time sheets, which

5    show time in for every day for both of the plaintiffs; pay

6    statements, which itemize the regular and overtime and

7    spread-of-hours pay; as well as signed payroll sheets, which

8    show the gross wages and Seamless tips earned, which was signed

9    by the plaintiffs on a weekly basis.

10        Now, as far as the time issue, which is the issue

11   plaintiffs' counsel have mentioned is in dispute, the

12   restaurant closed every day at 11.  The defendants did not keep

13   track of time out because all employees were assumed to have a

14   time out of 11 p.m.  That is the time the restaurant closed and

15   management locks up.  Therefore they reported time in, days

16   off, and if somebody came in for just a lunch shift or a dinner

17   shift, that would be noted on the time sheet.  But time out was

18   recorded at 11 p.m. every night, that an employee would work.

19        The evidence will also show that the plaintiffs

20   received cash, credit-card, as well as online sales tips from

21   Seamless, and that they were fully aware that these tips, as

22   well as meals from the restaurant, would be applied against the

23   minimum wage.  The plaintiffs cashed out their credit-card tips

24   every day on a daily basis at the end of their shift.  They

25   received their Seamless tips on a weekly basis, which they

F7RAROM1ps                    Opening - Ms. Kafedjian

1    signed for and acknowledged receipt of in their weekly payroll

2    receipts.

3            Defendants will also prove that the plaintiffs did not

4    and could not have spent more than 20 percent of their time

5    performing any non-tip duties as they have alleged.

6            As far as the bikes, there was no requirement by the

7    defendants that the delivery persons purchase or use bikes.

8    But in reality, having bikes helped the delivery workers make

9    more deliveries and earn more tips.  So it was not a

10   requirement on the part of the defendants; it's something

11   plaintiffs chose to do to help further their deliveries and

12   earning of tips.

13           There are, however, some issues with defendants'

14   records.  The first issue is, defendants had a business routine

15   of rounding weekly pay, which left them over or short regularly

16   a few dollars.

17           The second issue is, after January 1, 2011, the

18   defendants continued to calculate the delivery workers' tip

19   minimum-wage rate at $5, instead of applying the correct rate

20   of $5.65, and although the plaintiffs were being tipped enough

21   to make it sufficient under federal law, it was insufficient

22   under New York law.  And this also left the defendants a few

23   dollars short under state law for a portion of the period.

24           The defendants failed to provide the plaintiffs with

25   copies of the wage statements.

F7RAROM1ps

 1          And lastly, the defendants' calculations also failed

 2     to apply any meal credits to the plaintiffs' wages, although

 3     they were entitled to them.  Plaintiffs, as well as other

 4     employees, ate both lunch and dinner at the restaurant during

 5     the course of their shift.

 6          Notwithstanding the minor errors, however, we will

 7     show that plaintiffs' calculations of unpaid wages wholly

 8     contradicts the record in the instant case, and furthermore,

 9     that the plaintiffs' allegations are unsubstantiated and that

10     their narratives lack credibility.  The defendants have made a

11     good-faith effort to comply with all federal and state labor

12     law and have reasonable grounds to believe that their action

13     were in compliance and without any willful intent to violate

14     the FLSA or the New York Labor Law.  Therefore we respectfully

15     request that this Court find against the plaintiffs.

16          Thank you.

17          THE COURT:  Thank you.

18          I have a question of law before we start.  I

19     understand that there is a requirement that the employee be

20     issued a wage statement each time they're getting paid.  Is

21     there a requirement that the statement must be in any language

22     other than English?

23          MR. ANDROPHY:  Yes, your Honor.  I don't think I have

24     the section in front of me, but the New York Labor Law

25     requirements for the wage which they have been -- I believe,

F7RAROM1ps

1    and I'm speaking without it right in front of me, but I believe

2    it does require that it be provided both in the -- in English

3    and the language of the employee.  And that must include not

4    only the amount of wages received but also the rate of pay, any

5    credits claimed, and any deductions that were being taken from

6    the pay.

7              THE COURT:  I would appreciate your providing me with

8    that section when we have an opportunity.

9              All right, then.  You may call your first witness.

10             MR. CLARK:  Your Honor, the plaintiffs call Mr. Nelson

11   Murillo.

12             INTERPRETER 1:  Your Honor, Nicholas Luttinger,

13   interpreter.  Your Honor, if it's OK, in order to do this

14   simultaneous both ways, we are going to use headsets to listen

15   to the witness, but we will have to be within range of the

16   infra-red, which is being beamed out to the courtroom.  So to

17   consolidate our equipment, we will be interpreting from where

18   my partner is now.  I will explain that to Mr. Murillo so he

19   doesn't get confused.

20             INTERPRETER 2:  Your Honor, in order for the people to

21   understand the Spanish continuously, they have to listen with

22   an earphone so they can hear through the mike what is said.  If

23   we do simultaneous, usually people listen through earphones.

24             THE COURT:  No.  You need to use a -- usually, I

25   actually don't have any amplification whatsoever.  But if you

F7RAROM1ps

1    feel that you need a microphone, then we could find one, I'm

2    sure.

3              INTERPRETER 2:  We do have one.

4              THE COURT:  You have one.

5              INTERPRETER 2:  The problem is that when we interpret

6    simultaneously, is that when we speak very loudly we don't

7    hear.

8              THE COURT:  I have been going at this for 15-plus

9    years and I would say that at least 75 percent of my trials

10   have foreign-language interpreters and it went very, very

11   smooth I will.  I've never had a problem.  So if you can't do

12   it let me know.

13             INTERPRETER 2:  No, no, no, please tell us how to do

14   it.

15             THE COURT:  Well, it is not my job to be an

16   interpreter.  I can tell you how to be a judge.

17             INTERPRETER 1:  No, no, Carmen, they only have to hear

18   the English from us.

19             INTERPRETER 2:  I'm sorry.

20             INTERPRETER 1:  And the witness needs -- right.

21             THE COURT:  You may swear the witness.

22    NELSON MURILLO,

23        called as a witness by the plaintiff, having been

24        duly sworn through the interpreter, testified as follows:

25   DIRECT EXAMINATION

F7RAROM1ps                     Murillo - direct

1   BY MR. CLARK:

2   Q.  Good morning, Mr. Murillo.

3   A.  (Through interpreter)  Good morning.

4          MR. CLARK:  Your Honor, may I approach the witness?

5          THE COURT:  You may.

6          MR. CLARK:  I'm presenting the witness with the

7   document marked for identification as Plaintiff's Exhibit 10.

8   Q.  Now, Mr. Murillo, do you recognize this document?

9   A.  Yes.

10  Q.  And what is this document?

11  A.  It's my testimony.

12  Q.  Do you intend this testimony to be your direct testimony in

13  this matter?

14  A.  Yes.

15  Q.  Can you please turn to the last page.  Is this your

16  signature on this document?

17  A.  Yes.

18  Q.  Was this document translated to you into Spanish before it

19  was signed by you?

20  A.  Yes.

21         MR. CLARK:  At this point I would seek to admit the

22  trial declaration of Mr. Nelson Murillo.

23         THE COURT:  Any objection?

24         MS. KAFEDJIAN:  No, your Honor.

25         THE COURT:  It is admitted.  And so this is already a

1   premarked exhibit.  Is that it?

2           MR. CLARK:  It's marked as a plaintiff's exhibit.  It

3   was marked for identification as Plaintiff's Exhibit 10.  It

4   will be admitted as 10.

5           THE COURT:  So if you will you would please identify

6   which exhibit you're referring to and what number you want to

7   assign to it.

8           MR. CLARK:  Yes.  My apologies, your Honor.  I think I

9   mentioned it while I was walking over here, and I'm not sure if

10  I identified it correctly.

11          THE COURT:  So this you are admitting as Plaintiff's

12  Exhibit 10?

13          MR. CLARK:  As Plaintiff's Exhibit 10.

14          THE COURT:  All right then.  It is admitted.

15          (Plaintiff's Exhibit 10 received in evidence)

16          THE INTERPRETER:  If I may, your Honor, I'm not

17  hearing you through your microphone.

18          MR. CLARK:  Is that a little bit better?

19          THE INTERPRETER:  Yes.  You have to be at that

20  distance.  Otherwise you're just lost.

21          MR. CLARK:  And I have no further questions for this

22  witness.

23          THE COURT:  Cross-examination.

24  CROSS EXAMINATION

25  BY MS. KAFEDJIAN:

F7RAROM1ps                    Murillo – cross

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  Mr. Murillo, how long have you known the plaintiff?

4   A.  One year.

5   Q.  So did you work with them at Amma?

6   A.  Yes.

7   Q.  What period of time was that?

8   A.  It was for one year, from 2013 to 2014.

9   Q.  Was Mr. Juan Romero working at Amma during that time?

10  A.  No.  Juan didn't.

11  Q.  But Carmelo did?

12  A.  Yes.

13  Q.  And are you still working at Amma?

14  A.  No.

15  Q.  After you left Amma, did you file a lawsuit against the

16  same defendants in this case?

17  A.  Yes.

18          THE INTERPRETER:  I'm sorry.  Once again, your Honor,

19  if I'm going to be interpreting simultaneously, I have to be

20  able to hear.

21          MS. KAFEDJIAN:  No problem.

22          THE INTERPRETER:  Thank you.

23  Q.  Was that lawsuit concerning unpaid wages?

24  A.  Yes.

25  Q.  Are the attorneys sitting on the table over here the same

F7RAROM1ps                    Murillo - cross

1   attorneys representing you in that case against the defendants?

2   A.  Yes.

3   Q.  So isn't it true that if you help plaintiffs win this case

4   today, you would also be helping your own case?

5   A.  No.

6   Q.  Why not?

7   A.  What do you mean by your question?

8   Q.  Isn't it true that if you testify and help the plaintiffs

9   win their case today, this would also help you in your case

10  against your old boss?

11          MR. CLARK:  Objection.  Calls for speculation.

12          THE COURT:  Overruled.  You may answer, sir.

13  A.  I came -- no.  I came here to testify not on behalf of my

14  case but for them.

15  Q.  OK.  How did you hear about the job at Amma?

16  A.  A friend of mine took me.

17  Q.  OK.  And how long did you work there?

18  A.  Approximately a year and a month, something like that,

19  approximately.

20  Q.  And what was your position?

21  A.  Delivery screening, cleaning, clean the kitchen, peel

22  onions, clean the basement, clean the street.  Right.  I had to

23  use the vacuum.  I had to use the vacuum on the carpet.  I had

24  to clean.  I had to take things up.  I had to take out the

25  garbage.  I had to take apart boxes.  I had to clean the window

F7RAROM1ps                    Murillo - cross

1   glass on the doors.

2   Q.  I'm just asking about what's your position.

3   A.  Cleaning --

4   Q.  What was your position?

5   A.  According to the -- my -- mine, I was the deli wait boy --

6          I was a delivery boy.

7          THE INTERPRETER:  Interpreter correction.

8   Q.  Did you have a bike?

9   A.  Yes.

10  Q.  Could you make deliveries without that bike?

11  A.  No.

12  Q.  Why not?

13  A.  Because it would take too long, and there were problems

14  when it takes too long.

15  Q.  Well, what's the average distance you had to travel for a

16  delivery?

17  A.  About 15 blocks.

18  Q.  And how many deliveries did you make a day?

19  A.  About 30, more or less.  I can't give you an exact

20  approximate, but between 30 and 35.

21  Q.  Was this typical for delivery workers, between 30 and 35

22  deliveries a day?

23          THE INTERPRETER:  I'm sorry?

24  Q.  Was this typical?

25  A.  Yes.

F7RAROM1ps                    Murillo - cross

1   Q.  OK.  And how long did each delivery take?

2   A.  It depended on the distance.

3           THE COURT:  But what did you mean by "take"?

4   Q.  How long did the average delivery take back and forth?

5           THE COURT:  Are you talking about the round trip?  Is

6   that it?

7           MS. KAFEDJIAN:  Yes, the time.

8   A.  You mean from the restaurant to the client and returning?

9   Q.  Yes.  Time.

10  A.  Truth is I have no idea, because I've never watched the

11  time.

12  Q.  Well, if you did 30 to 35 deliveries a day for a year and I

13  couple of months, you must have some estimate as to what your

14  average delivery trip took.

15          THE COURT:  All right, counsel.  Your job is to ask

16  questions, not to make declarations.

17  Q.  To make these deliveries, did you have to read an address?

18          To make these deliveries, did you have to read an

19  address on a piece of paper?

20  A.  Yes.

21  Q.  Was that address in English?

22  A.  Yes.

23  Q.  Did you have to read street signs and number of addresses,

24  in English?

25  A.  Yes.

1            THE COURT:  Did you ask whether he had to read street

2    signs and numbers in English?

3            MS. KAFEDJIAN:  Yes.

4            THE COURT:  Are you presuming that the numbers in

5    English are different from the way they look in his language?

6            MS. KAFEDJIAN:  No, but I have a point that I will be

7    making --

8    Q.  Well, let me ask you, are the numbers in Spanish different

9    than the numbers in English?

10   A.  No.

11   Q.  OK.  Did you also have to read those numbers on receipts

12   and collect cash payments for customers?

13   A.  It depended on whether the orders were made for cash,

14   because there were a lot of orders that were made on the

15   Internet.

16   Q.  But you had basic enough of a reading comprehension and

17   English comprehension to read street signs, receipts, and

18   addresses.

19   A.  Yes.

20   Q.  OK.  During your employment, did you earn tips for your

21   deliveries?

22           THE INTERPRETER:  Once again, please?  I'm having

23   trouble.

24   Q.  During your employment, did you earn tips for your

25   deliveries?

F7RAROM1ps                    Murillo - cross

1    A.  Only street deliveries for credit-card accounts.

2    Q.  OK.  And what about cash tips?

3    A.  I retained the tips, justify the tips, and I handed in what

4    was paid for the deliveries.

5    Q.  So you took cash tips directly into your pocket.

6    A.  Yes.

7    Q.  And how did you get the credit-card tips?

8    A.  In those from credit card, the credit-card tips, were given

9    to me in the afternoon, evening, when they close the

10   restaurant.

11   Q.  And about how much did you make a week in cash and

12   credit-card tips?

13   A.  A week?

14   Q.  Yes.

15   A.  I don't remember.  Every day.

16   Q.  OK.  Let me ask you --

17   A.  But -- but it wasn't much, with the Seamless company, when

18   maybe every 20 deliveries I would get two cash.

19   Q.  So you're saying the majority of the deliveries were

20   Seamless?

21   A.  Yes.

22   Q.  Are you alleging, Mr. Murillo, that no one ever explained

23   to you that your pay would not be reduced by the minimum wage

24   by your tips?

25             MR. CLARK:  Objection.

1    THE COURT:  What was ground?

2    MR. CLARK:  I don't think the witness understands the

3    question.

4    Q.  Are you alleging that no one ever explained to you that

5    your minimum-wage rate would be reduced by the tips you earned?

6    A.  No.  No.

7    Q.  Your employer never told you this?

8    A.  No.

9    Q.  Did you ever sign a piece of paper saying you acknowledged

10   this fact?

11   A.  No, I did not.

12   Q.  Are you sure?

13   A.  Well, I signed a document at one point, but I didn't know

14   what it was.  And then it was explained to me, a friend of mine

15   told me after I had signed it, but I didn't know that.

16   THE COURT:  Don't testify as to what someone told you.

17   Only testify as to what you know.

18   THE WITNESS:  OK.

19   Q.  So you did sign a document.

20   A.  Yes, I did sign a document.  But I didn't know what it was.

21   Q.  Was it in English?

22   A.  Well, it was in English, but I didn't really pay attention

23   whether it was in Spanish.  And later on I asked for a copy.

24   But I was told that I was going to be given it next week, and

25   then a week came by, another came by, and I never got it.

F7RAROM1ps                    Murillo - cross

1    Q.  So you signed a document that was in English and Spanish

2    and you didn't read it?

3    A.  I didn't read it.  No.  The truth is I did not.

4    Q.  OK.  Did that document tell you that your tips would be

5    applied to your minimum-wage rate?

6    A.  I just know I didn't read the document.

7    Q.  Did your employer ever inform you that any meals you ate at

8    the restaurant would be applied toward your pay rate?

9    A.  No.

10   Q.  Did you ever sign a document that said your meals would be

11   applied towards your pay rate?

12   A.  A document?  No.  The only one I signed is the one that I

13   explained to you already.

14   Q.  OK.  Did you have to sign in and out every day?

15   A.  At the beginning no, but it was three months before I left,

16   yes.

17   Q.  And what happened three months before you left?

18   A.  Well, I was given a code for me to punch also.

19   Q.  Punch in a computer?

20   A.  Yes.

21   Q.  So this computer recorded your time in and time out?

22   A.  Yes.  Yes.

23       THE COURT:  The witness cannot testify as to what the

24   computer was doing.

25       MS. KAFEDJIAN:  Well, if he was signing in and signing

1   out -- well, I just want to say -- so the computer --

2           THE COURT:  Your question is whether or not the

3   computer is recording it.  How can he know what the computer

4   records?  He can only testify to what he did.  Unless of course

5   he was given a receipt from it.

6           MS. KAFEDJIAN:  Withdrawn, your Honor.

7   Q.  When you took breaks, did you have to punch in and out?

8   A.  No.

9   Q.  What about when you came in late or left early?

10  A.  Well, I never came in late and I never left early.  You

11  know, maybe I left early three or four days, two -- from two to

12  four times, but no more.

13  Q.  So over the course of a year and a couple months, you only

14  worked less than a full shift on two or three occasions?

15  A.  Well, not actually -- not really leaving early.  Coming in

16  late.  Maybe three or four times only.

17  Q.  And you left before the dinner shift?

18  A.  No.

19  Q.  So when you left early, what does that mean?

20  A.  I really didn't leave early.  What I said was that I

21  arrived late a few times.

22  Q.  And so for a year and a couple of months you never left

23  before the end of your shift?

24  A.  No.

25  Q.  Did you ever take days off?

F7RAROM1ps                    Murillo - cross

1    A.  No.

2    Q.  How many days did you work a week?

3    A.  Six days.

4    Q.  Were you paid by the hour?

5    A.  No.

6    Q.  How do you know you weren't paid by the hour?

7    A.  Well, they always paid me -- actually, they always paid me

8    $375 per week.  That's it.

9    Q.  Did you ever receive a payment of more or less than $375 a

10   week?

11   A.  Yes.  After I was working for eight months, my rate went up

12   to 400.

13   Q.  And then, did it stay 400?

14   A.  Then the last month that I was working, then I ended up

15   making 450.  That was for a month or so.

16   Q.  So you're saying your pay rate stayed at those round

17   figures?

18   A.  Yes.

19   Q.  But then again you never left earlier than the end of your

20   shift for the entire time you worked for the defendants; is

21   that correct?

22   A.  No.

23   Q.  Why is that not correct?  I thought you testified that you

24   only came in late two or three times but never left early for

25   the entire time you worked for the defendants.

F7RAROM1ps                    Murillo - cross

1   A.  Well, no.  I never left early.  Sorry.  I did get there

2   late about three or four times.

3   Q.  Correct.  So if you worked to the end of the shift for the

4   entire length of your employment, wouldn't you be paid for the

5   full hours of a full day?

6           THE INTERPRETER:  Could you please repeat for the

7   interpreter.

8           MS. KAFEDJIAN:  No problem.

9   Q.  If you worked for the entire length of your employment,

10  full shifts, would you not be paid full hours for a full day of

11  work?

12  A.  What is that?  Sorry.

13  Q.  Why would your rate change if your hours didn't change?

14  A.  Because I asked for an increase, because it seemed to me I

15  was not making enough money, working 12 and 13 hours a day.

16  That's why I requested more money.  And that's when it went up

17  to a different amount.  And then 50, when I got to make 450.

18  Q.  So the defendant at some point did give you a raise.

19  A.  You mean the government?

20  Q.  The defendant.  The defendant.

21  A.  Yes.  They increased to 400 and then 450, yes.

22  Q.  So despite this raise, my question to you is, if you worked

23  a full shift as you claimed, 12 or 13 hours every day, why

24  would your pay rate change?

25          THE COURT:  I don't understand the question, counsel.

F7RAROM1ps                    Murillo - cross

1              MS. KAFEDJIAN:  Withdrawn.

2    Q.  If your hours for the entire length of your employment were

3    the same every day, why would you expect to be paid a weekly

4    rate of different amounts, not including tips?

5    A.  Please repeat, because I do not understand.

6              THE COURT:  All right.  So the witness has stated that

7    he was paid one salary, that he got an increase, and then he

8    got another increase.

9              MS. KAFEDJIAN:  Right.  But he's also claiming that

10   the he was paid the same time for that entire time for that

11   period before the rate, despite the hours that he worked.  So

12   what I'm trying to understand, if he's working the same hours

13   every day, as he claimed he never left early and only came in

14   late two or three times, why his pay would change.

15             THE COURT:  I don't understand your question.

16             MS. KAFEDJIAN:  That's fine.  We can leave that point.

17   We'll move on.

18   Q.  Did you receive Seamless tips?

19   A.  No, never.

20   Q.  Are you sure about that?

21   A.  I'm sure.

22   Q.  Did you ever sign acknowledgment that you received Seamless

23   tips?

24   A.  No.

25   Q.  Did you ever sign any documentation for the defendants,

F7RAROM1ps                    Murillo - cross

1    other than the page you talked about earlier?

2    A.  Apart from that, that document, no.

3    Q.  Well, how did you receive your pay?

4    A.  To receive the payment, they would make me sign a notebook

5    like this one.

6         MS. KAFEDJIAN:  Can he show the Court the notebook

7    that he's pointing to.

8         THE WITNESS:  That one, yes.  A smaller one than this

9    one.

10   Q.  And you signed that how often?

11   A.  Just for me to receive the envelope, and I had to sign.

12   Q.  And what was on that paper?

13   A.  I never read it because they didn't really show it to us.

14   They just showed us the last page and then we had to sign down

15   there.

16   Q.  How did they not show it to you?  How was the notebook

17   presented to you?

18   A.  Well, I was just told to sign over here.  Everybody was

19   told to sign down there.  So to get my money I did.

20   Q.  This is very important.  Can you please show the Court how

21   the notebook was held so that you could sign.

22   A.  It was given to me like this.  And the place that I had to

23   sign was down here.  And I never saw what was written before

24   that or -- so I just signed here.

25        THE COURT:  Sorry.  So the witness, who is holding one

F7RAROM1ps                    Murillo - cross

1   sheet of this spiral notebook, where the spiral is on the top,

2   he was holding one sheet up and then with the other hand he was

3   pointing to the sheet that followed on the bottom.

4   Q.  And did you ever read what was on the page you were

5   signing?

6   A.  Well, they never showed it to me.

7   Q.  Well, did you ever ask to read it?

8   A.  No.

9   Q.  Just like you didn't ask to read the page with the tips?

10  A.  What's that?

11  Q.  You testified earlier that you signed a piece of paper

12  which had some information regarding the tips that would be

13  applied to your minimum-wage rate.  You stated that you did not

14  read that, so you did not read --

15  A.  I don't really know what that document had to do with.  I

16  never read it.

17             THE COURT:  Do you read in Spanish?

18             THE WITNESS:  No.

19             THE COURT:  Do you know how to read in Spanish?

20             THE WITNESS:  Yes.

21             THE COURT:  Do you know how to read English?

22             THE WITNESS:  No.

23  Q.  So if that document was translated in English and Spanish,

24  you just chose not to read it, correct?

25             THE COURT:  Counsel, the only purpose is these acts

F7RAROM1ps                    Murillo - cross

```
 1   that are not being said.
 2              MS. KAFEDJIAN:  We would like to mark this G, your
 3   Honor.  This is a binder of Mr. Murillo's employment records.
 4              THE COURT:  What exhibit is that?
 5              MS. KAFEDJIAN:  We're going to mark this as
 6   Defendant's G.  It has not been marked, your Honor.
 7              THE COURT:  So is that something that you've already
 8   handed up to me?
 9              MS. KAFEDJIAN:  No.
10              THE COURT:  So this is something for me to read.
11              MS. KAFEDJIAN:  Yes, your Honor.
12              THE COURT:  Well, the whole idea was for you to show
13   me all of your exhibits in advance of trial.
14              MS. KAFEDJIAN:  Well, we didn't know how this witness
15   would testify, your Honor.  This is submitted for impeachment
16   purposes.  This is his employment records.
17              THE COURT:  Do you have a copy for me?
18              MS. KAFEDJIAN:  Yes, your Honor.
19              And for the witness, there you go.
20   Q.  I think we will start with tab no. 5, the last tab.
21   Mr. Murillo, could you please turn to that.  Is that your
22   signature on that page?
23   A.  Yes.
24   Q.  Is that page written in Spanish and in English?
25   A.  No.
```

F7RAROM1ps                    Murillo - cross

1    Q.  I will show you a page which we have marked as an exhibit

2    of pay rate and pay date.

3    A.  I don't know.

4            MS. KAFEDJIAN:  May I approach the witness, your

5    Honor?

6            THE COURT:  You may.

7            MS. KAFEDJIAN:  To show him that page.

8    Q.  OK.  Mr. Murillo, you can read Spanish, correct?

9    A.  Yes.

10   Q.  OK.  Does this page have both Spanish and English on it?

11   A.  Actually, to tell you the truth, I don't see anything in

12   Spanish.

13   Q.  You don't see anything in Spanish on this page?

14   A.  No.

15   Q.  Are you sure you can read Spanish?

16   A.  I can read Spanish.

17   Q.  OK.  So let's start box no. 1, where it says "name,"

18   *nombre*.  Is the word *nombre* in Spanish?

19   A.  Yes.

20   Q.  OK.  The next one.  Is there a translation under the

21   English and Spanish, *nombre comercial*?

22           THE INTERPRETER:  Could you repeat that last?

23           MS. KAFEDJIAN:  I think it's *comercial*.

24   A.  Yes.

25   Q.  So do you agree that there is a Spanish translation on this

F7RAROM1ps                    Murillo - cross

 1   page?

 2   A.  (Pause).

 3          THE COURT:  Counsel, unless he speaks both Spanish and

 4   English, he can't answer that question.  The only question he

 5   can answer is whether he sees Spanish on the page.

 6          MS. KAFEDJIAN:  OK.

 7   Q.  Do you agree that there is Spanish on the page?

 8   A.  Yes.

 9   Q.  If you look at no. 3, does it say that you will receive $5

10   *por hora*?

11          THE COURT:  Counsel, you can't testify in Spanish.

12          MS. KAFEDJIAN:  OK.

13   Q.  Per hour?  Sorry.

14   A.  Yes.

15   Q.  If you go to no. 4, does it say your tips are $3 per hour?

16   A.  Yes.

17   Q.  And under that does it say your meals are $4 per meal?

18   A.  Yes.

19   Q.  Does it also explain in no. 7 that you would be making 7.50

20   an hour?

21   A.  Yes.

22   Q.  OK.  If you could turn to tab 1, the attendance sheet, tab

23   1, the first tab.  Do you see your name listed on the time

24   attendance sheet?

25   A.  No.

F7RAROM1ps                     Murillo - cross

```
1   Q.  If you scroll down the left column, on the first page it's
2   all the way at the bottom, in the remainder of the pages it's
3   in the middle of the column.
4   A.  Here it is.  Yes.
5   Q.  Can you flip through the pages and look at some of your
6   time in?
7               THE COURT:  OK.  So, counsel, he is looking --
8   A.  -- it's here, yes.
9               THE COURT:  -- at this document and testifying about
10  this document.  It's not in evidence.
11              MS. KAFEDJIAN:  Don't I need to authenticate all the
12  pages before we can attempt to enter into evidence?
13              THE COURT:  So the question is, how would you
14  accomplish that.
15              MS. KAFEDJIAN:  Well, if he recognizes it, he can.  If
16  not we'll have to wait for the defendants.
17              THE COURT:  Well, I'm assuming that you're going to
18  try to get this in as a business record.  Is that correct?
19              MS. KAFEDJIAN:  Yes.
20              THE COURT:  How could he possibly authenticate it for
21  business?
22              MS. KAFEDJIAN:  OK.  So I just want to make two more
23  points with this exhibit.
24              THE COURT:  This exhibit is not in evidence.  So I
25  don't see the value of his testimony.
```

F7RAROM1ps

| | |
|---|---|
| 1 | MS. KAFEDJIAN:  There is impeachment value. |
| 2 | The next tab, your Honor -- |
| 3 | THE COURT:  So far what you've done is to ask him |
| 4 | whether this exhibit contains certain information. |
| 5 | MS. KAFEDJIAN:  Correct. |
| 6 | THE COURT:  But this is not in evidence. |
| 7 | MS. KAFEDJIAN:  I would like to impeach his testimony |
| 8 | with tabs 3 and 4 regarding being paid by the hour.  They are |
| 9 | itemized pay statements and for which he signed. |
| 10 | THE COURT:  So then we'll have to have the witness -- |
| 11 | I can't get him to step out because he is a party.  But -- |
| 12 | MS. KAFEDJIAN:  He's not a party. |
| 13 | THE COURT:  Pardon? |
| 14 | MS. KAFEDJIAN:  He's not a party. |
| 15 | THE COURT:  He isn't currently an employee.  So he can |
| 16 | step out. |
| 17 | (Witness excused) |
| 18 | MR. CLARK:  Your Honor, I would just like to confirm |
| 19 | with the witness that he still needs to stay and then -- |
| 20 | THE COURT:  He can step out for a minute. |
| 21 | MR. CLARK:  Yes.  I just wanted to be sure that he |
| 22 | understood. |
| 23 | MR. ANDROPHY:  He's here. |
| 24 | THE COURT:  The idea is that he needs to step out. |
| 25 | MR. ANDROPHY:  Would one of the interpreters please |

F7RAROM1ps

1   come to help.

2           (Pause)

3           THE COURT:  So exactly how is it that you're going to

4   accomplish his impeachment from using this document?

5           MS. KAFEDJIAN:  Two things.  The first is his

6   knowledge that he signed that.  We've accomplished that

7   already.

8           THE INTERPRETER:  I'm sorry, counselor.  I need to get

9   this.

10          MS. KAFEDJIAN:  The other two tabs we're looking at

11   are the pay statements and signed pay statements.  So the

12   computerized ones have itemizations of the exact hours, time

13   in, time out, and itemization of how he was paid by the hour.

14   The witness is claiming that he was not paid by the hour and

15   that he worked 12 to 13 hours a day.  This clearly shows that

16   he did not.

17          THE COURT:  So, counsel, what you would need a witness

18   to do is to agree with the document.  It doesn't matter that

19   the document says such a thing.  The question is, does he

20   agree.

21          MS. KAFEDJIAN:  We were getting to that.

22          And then the other one is the signed pay statements.

23   He claims he didn't receive payments.  The sheet here clearly

24   shows itemizations of Seamless tips, which he signed.

25          THE COURT:  So you're seeking a way to ask him this

F7RAROM1ps                    Murillo - cross

 1   question.  All right.  Well, it seems like a very long time to

 2   wait to ask those questions.

 3            MS. KAFEDJIAN:  I apologize.  I will move through it

 4   more quickly.

 5            THE COURT:  Would you please bring the witness back.

 6   NELSON MURILLO, Resumed.

 7            (Pause)

 8            THE COURT:  All right, then.  You may continue with

 9   your inquiry.

10   CROSS EXAMINATION (Cont'd)

11   BY MS. KAFEDJIAN:

12   Q.  Mr. Murillo, please turn to tab 2 in the booklet.  These

13   pay statements show that your time out on a regular basis was

14   at 2300, which is 11 p.m.

15            MR. CLARK:  Objection.

16   Q.  Is that accurate?

17            THE COURT:  Are you asking him whether it's

18   accurate --

19            MS. KAFEDJIAN:  Yes.

20            THE COURT:  -- that the page says that?  Or whether

21   it's accurate that he left at 11 o'clock?

22            MS. KAFEDJIAN:  Is it accurate that he left at 1

23   o'clock, at the stated date.

24            MR. CLARK:  Objection.  I just don't see the purpose

25   of this document, with her question.

F7RAROM1ps                    Murillo – cross

 1            THE COURT:  Well, she says that she's using this

 2   document to impeach the witness.

 3            MR. CLARK:  And I don't see specifically how that

 4   question impeaches any of the testimony that has been raised

 5   thus far.

 6            THE COURT:  So you're saying that he did not say that

 7   he worked beyond 11 o'clock.  Is that what you're saying?

 8            MR. CLARK:  In the testimony that has been raised on

 9   cross so far, no.

10            THE COURT:  All right then.

11   Q.  Mr. Murillo, what time, until what time did you work?

12   A.  I came to work at 11 in the morning and I left from work at

13   between 11 and 11:30 at night.

14            THE INTERPRETER:  Interpreter correction, sorry:

15   A.  Between 11:30 and 12.

16   Q.  So you left work between 11:30 and 12 every night?

17   A.  Yes.

18   Q.  So this computer pay statement showing that you clocked out

19   at 2300 is not correct?

20   A.  No.

21   Q.  Well, did you sign out when you left?

22   A.  Yes.

23   Q.  And how did you sign out?

24   A.  Just simply by putting in some numbers, a code that I had

25   been given.

F7RAROM1ps                     Murillo - cross

1    Q.  And when you stayed till 11:30, till 12 at night, were you

2    alone?

3    A.  No.  I was there with my fellow workers.

4    Q.  Who were these workers?

5    A.  All of them that were working during my delivery session.

6    Q.  Was it only delivery workers or was it also the kitchen

7    staff and the wait staff?

8    A.  There was an assistant in the kitchen only that was with

9    us.

10   Q.  So all the waiters and the rest of the kitchen staff went

11   home?

12   A.  Yes.

13   Q.  And what time did they go home?

14   A.  The truth is I really don't know.

15   Q.  But they went home before you.  Is what you're claiming?

16   A.  Earlier than we did, yes.

17   Q.  OK.  And what was the name of the kitchen assistant that

18   stayed?

19   A.  Chilogalli.  Chilogalli.

20   Q.  And did this Chilogalli have keys to the premises?

21   A.  No.

22   Q.  How did you lock up when you left?

23   A.  No.  I wasn't the one that -- I believe it was the manager

24   or some other employee that closed up, that locked up after we

25   had left.  However, they didn't stay with us late after hours

F7RAROM1ps                    Murillo - cross

1   cleaning or anything like that.  They simply came in after we

2   left to lock up.

3   Q.  So you're saying that a manager left early, left you to

4   clean without any supervision, and then returned to lock up the

5   premises?

6   A.  No.  He would wait outside in the restaurant while we

7   cleaned up inside the kitchen.

8   Q.  And who was this person?

9   A.  I don't know the name of the manager.  However, the guy's

10  name was Salvador Reyes.

11  Q.  And who was Salvador?

12          Who was Salvador?

13  A.  He is one of the workers there.

14  Q.  OK.  Did Salvador have keys?

15  A.  Yes.

16  Q.  So what was Salvador's position?

17  A.  How can I explain that to you.  He cleared the place.  And

18  he would ask for the -- he would put in the order for the food,

19  and he would distribute the tickets.

20  Q.  In the kitchen?

21  A.  Yes.

22  Q.  So he's a kitchen employee.

23  A.  Yes.

24  Q.  And this kitchen employee had keys to lock up the

25  restaurant?

1   A.  Salvador did, yes.

2   Q.  And so while you were working with the other delivery

3   employees cleaning after hours, he just waited inside the

4   restaurant?

5   A.  Just waiting in the restaurant for to us finish.

6            THE WITNESS:  Yes.

7   Q.  He sat in the dining room?

8   A.  Yes.

9   Q.  On a table?

10           THE INTERPRETER:  On a table?

11  Q.  Sitting at a seat at a table?

12  A.  Yes.  Sometimes he would be seated at a table.  Sometimes

13  he would be outside.

14  Q.  And he did no work.

15  A.  No.

16  Q.  If you would please turn to tab 3.  Is that your signature

17  on those pages?

18           THE INTERPRETER:  I hope we're on page 3.

19  Q.  Or tab 3.

20  A.  Yes.

21  Q.  Are these the pages you had to sign every week?

22  A.  Yes.

23  Q.  Do those pages -- did you ever see those pages?

24  A.  Not this part over here.  Just this wide area where I used

25  to sign.

F7RAROM1ps                    Murillo - cross

1    Q.  OK.  Why don't you turn to the second page.  Is your

2    signature directly over the numbers on that page?

3    A.  No.

4    Q.  Where is your signature on that page?

5    A.  My signature is not there.

6    Q.  That's not your signature in the center of the page?

7    A.  No.

8             THE COURT:  Sir, what is your first name?

9             THE WITNESS:  Nelson.

10   Q.  Why don't you turn to the page marked February 4, 2013.

11   It's a few pages over.

12            THE INTERPRETER:  Could you please repeat the date for

13   the interpreter.

14            MS. KAFEDJIAN:  February 4, 2013.

15   Q.  Is that your signature at the bottom of that page?

16            THE INTERPRETER:  Your Honor, the interpreter would

17   like to note that the date's name is reversed.  2/4/13.

18            MS. KAFEDJIAN:  The date, you mean, is reversed?

19            THE COURT:  In other words, the way that documents are

20   dated in Spanish is different from the way they are dated in

21   English.  The day of the month would come first in Spanish.

22   Q.  Is that your signature at the bottom of that page?

23   A.  Which one?

24   Q.  The page marked --

25   A.  Which page?

F7RAROM1ps                    Murillo - cross

1    Q.  -- 2/4/13.

2    A.  No.

3    Q.  So let me understand.  Are you saying these are your

4    signatures on these pages, or they are not --

5    A.  I'm sorry.  This page says that I made 733?  Is that what

6    it says?

7    Q.  I'm asking, is that your signature?

8    A.  No.

9    Q.  So it's not your signature.

10   A.  No.  I don't remember ever signing a paper with 733.

11   Q.  OK.  Are any of these pages your signature?  Can you please

12   go through them and let me know if they are or are not your

13   signatures.

14   A.  Some do, but others don't seem to be my signature.

15   Q.  Could you please --

16   A.  Well, it seems to have, one of them seems to have my

17   signature, but I never remember receiving 733 like it says over

18   here.  And then 2/4/13 there is 733 right on top of my

19   signature, and I don't remember ever receiving that money.  And

20   I had to see the number to be able to sign it.  And I never saw

21   it.

22            THE COURT:  So what do you mean you did not see the

23   number?  What did you see?

24            THE WITNESS:  That I was not able ever to see the

25   numbers, and then here my signature appears on top of the

F7RAROM1ps                        Murillo - cross

1    numbers.

2              THE COURT:  So you're saying that this is your

3    signature.  For example, on the first document, which is marked

4    12/31/12, which would be the 31st of December 2012, do you see

5    that?

6              THE WITNESS:  12/31/12?

7              THE COURT:  Yes.

8              THE WITNESS:  Yes.

9              THE COURT:  That's your signature on the bottom?

10             THE WITNESS:  Yes.

11             THE COURT:  When you signed this, did you see the

12   numbers that appeared on this page?

13             THE WITNESS:  No.  I never saw any numbers.

14             THE COURT:  Are you saying that you signed a blank

15   page?

16             THE WITNESS:  Yes.  Well, as I explained before, I

17   didn't know what it contained on the top, because I was just

18   shown what was on the bottom.  I didn't know what was under.

19             THE COURT:  OK.  So again, you're using the spiral

20   notebook, which has the spiral at the top.  You're holding one

21   page folded over with your right hand.  And then you're

22   pointing to the second page at the bottom.  And so are you

23   saying that, if there were writing on the page, it would have

24   been obscured by the top page?

25             THE WITNESS:  Yes.

F7RAROM1ps                    Murillo - cross

1   Q.  So how do you explain the second page where your signature

2   is in the middle of the sheet?  Those particular numbers would

3   not have been obscured.  Is that correct?

4   A.  Well, those numbers weren't there.  I never signed anything

5   like that.

6   Q.  Well, if you didn't read it, how do you know what it says?

7   A.  Well, I never read it.  How could I know what it said if I

8   didn't read it?

9   Q.  OK.  But in that particular case on page 2, the numbers

10  were not obscured.  You just chose not to read it?

11            MR. CLARK:  Objection.

12            THE COURT:  No, these numbers could have been written

13  before or after he signed it.  So the question is not whether

14  he read it or not.

15            MS. KAFEDJIAN:  We need to establish what was on the

16  page.

17            THE COURT:  That's right.  You can ask him that

18  question.

19  Q.  So when you signed that second page, was your signature

20  there?  Was that page blank?

21  A.  Yes.  Well, I would like to see the original of this one,

22  because I never saw those numbers.  I don't know the date on

23  this page, but it is 697, I did not.  I never made 697.  I was

24  never paid that.

25            MS. KAFEDJIAN:  One moment, your Honor.

1              Your Honor, may I approach the witness?

2              THE COURT:  You may.

3              MS. KAFEDJIAN:  I'm handing the witness a receipt book

4    with the page open towards the date.

5              THE INTERPRETER:  Could you please repeat?

6              MS. KAFEDJIAN:  Towards page 2, which is the receipt.

7    Q.  Is that the original page which you signed, Mr. Murillo?

8    A.  Yes.  But it was blank.

9    Q.  So you were signing blank pages every week?

10   A.  Yes.

11   Q.  So why did they have to obscure what was written on it, if

12   it was blank?

13             THE COURT:  Counsel, you're asking him to testify as

14   to what another person is thinking?  Let's start with the

15   fundamental of trial evidence.

16             MS. KAFEDJIAN:  I apologize, your Honor.

17             We have no further questions.

18             MR. CLARK:  This is a very brief redirect, your Honor.

19             THE COURT:  Please.

20   REDIRECT EXAMINATION

21   BY MR. CLARK:

22   Q.  Now, earlier in your testimony, you testified that you

23   performed approximately 30 to 35 deliveries a day, correct?

24   A.  Yes.

25   Q.  You were also asked to approximate how much time a round

F7RAROM1ps                    Murillo - redirect

1    trip of deliveries would take you.  Do you remember that

2    testimony?

3    A.  Yes.

4    Q.  Now, on an example round trip of deliveries, did you have

5    to make multiple deliveries?

6    A.  Yes.

7    Q.  And approximately how many deliveries would you make on a

8    single trip?

9    A.  Well, it depended, but sometimes when things were

10   difficult, I could make seven or eight deliveries.

11   Q.  And how often do you think that happened?

12   A.  Busy days, you know, like Mondays, Fridays.  They depended.

13   On the busy days, quite a lot of them.

14   Q.  Can you approximate how many deliveries you'd make on a

15   typical trip?

16   A.  Well, it depended.  When we were busy, six, eight,

17   sometimes four.

18   Q.  And so how many trips would you like to take in a typical

19   workday?

20   A.  Well, the truth is that I don't have any idea how many

21   trips I made.

22   Q.  So would it vary a lot?

23   A.  Yes.

24           MR. CLARK:  I have no further questions of this

25   witness.  Thank you.

F7RAROM1ps                        C. Romero – direct

1           THE COURT:  Any recross?

2           MS. KAFEDJIAN:  No, your Honor.

3           THE COURT:  You may step down.

4           (Witness excused)

5           THE COURT:  Please call your next witness.

6           MR. CLARK:  Your Honor, we call to the stand

7   Mr. Carmelo Romero.

8    CARMELO ROMERO,

9         a plaintiff herein, having been duly sworn

10        through the interpreter, testified as follows:

11           THE COURT:  You may be seated.

12           You may inquire.

13   DIRECT EXAMINATION

14   BY MR. CLARK:

15   Q.  Good morning, Mr. Romero.

16   A.  Good morning.

17           MR. CLARK:  Your Honor, may I approach the witness?

18           THE COURT:  You may.

19           MR. CLARK:  I am just handing the witness an exhibit

20   marked for identification as Plaintiff's Exhibit 11.

21   Q.  Mr. Romero, do you recognize this document?

22   A.  I have never seen it before.

23   Q.  Excuse me?

24   A.  Well, I don't remember very well.  Is this my testimony?

25   Could I read it?  Or can I read it?

F7RAROM1ps                      C. Romero - direct

1   Q.  Yes, if you would like to examine the document.

2   A.  I don't understand it very well.  But if it's my testimony,

3   well, it is.

4   Q.  Can you turn to the last page of the document.

5   A.  Yes.

6   Q.  Is that your signature at the last page of this document?

7   A.  Yes, it is.

8   Q.  And do you recall this document being translated into

9   Spanish for you?

10  A.  I don't remember.

11  Q.  Do you recall this, sir, this document being your

12  declaration for this matter?

13  A.  Well, the thing is that I saw another paper.  I'm not sure.

14  Q.  Was this declaration translated to you in Spanish?

15  A.  I don't remember.

16  Q.  Did you ever receive a document translated into Spanish

17  that explained your testimony in this matter?

18  A.  Yes.

19  Q.  Yes.  And was that explained to you as being a translation

20  of this document that you see before you?

21  A.  Yes.

22  Q.  So do you understand this to be your trial declaration in

23  this matter?

24  A.  Yes.  It's the one I gave previously.

25  Q.  OK.  And you understand that is why you signed this

F7RAROM1ps                          C. Romero - cross

 1  document, correct?

 2  A.  Yes.

 3          MR. CLARK:  At this point I would like this document

 4  to be admitted into evidence as Plaintiff's Exhibit 11, as the

 5  trial testimony of Mr. Carmelo Romero.

 6          THE COURT:  Any objection?

 7          MS. KAFEDJIAN:  No objection.

 8          THE COURT:  It will be admitted as -- plaintiff?

 9          MR. CLARK:  Plaintiff's Exhibit 11.

10          THE COURT:  -- as Plaintiff's Exhibit 11.

11          (Plaintiff's Exhibit 11 received in evidence)

12          MR. CLARK:  I have no further questions, your Honor.

13          THE COURT:  Cross-examination.

14  CROSS EXAMINATION

15  BY MS. KAFEDJIAN:

16  Q.  What is your relationship to the defendant Juan Romero?

17  A.  He's my brother.

18  Q.  And when did you begin working for Amma?

19  A.  2008.

20  Q.  And when did your brother begin working there?

21  A.  A little bit later, after I started working there.

22  Q.  And when did you stop working at Amma?

23  A.  November 26, 2013.

24  Q.  You stopped working on November 26, 2013?

25  A.  Yes.

F7RAROM1ps                          C. Romero - cross

1   Q.  So you worked there for about five years?

2   A.  Yes, approximately that time, that much, but I don't know

3   exactly how long.

4   Q.  And how many delivery workers were there when you were

5   employed there?

6   A.  We were three delivery people plus one who worked in the

7   kitchen, and then if we were really busy, then somebody else

8   would come out and help.

9   Q.  So sometimes you were so busy that you needed a kitchen

10   employee to come and do deliveries?

11   A.  Yes.  Somebody would come out from the kitchen, you know,

12   the kitchen helper, or assistant.

13   Q.  And so he would act as a part-time delivery man?

14   A.  I don't understand your question.

15   Q.  That's OK.

16          Where is Amma located?

17   A.  It's at 246 51st Street.

18   Q.  That's in Manhattan?

19   A.  Yes.

20   Q.  Is it a busy area?

21   A.  I would say, yes.

22   Q.  And how big was the restaurant?

23   A.  It's not very big.

24   Q.  So it's not a big restaurant.  How big was the dining room?

25   A.  Well, I really don't know, but, you know, I never really

F7RAROM1ps                          C. Romero - cross

1    come to the tables, but approximately 13 to 14 tables.

2    Q.  And how big is the bathroom?

3    A.  Not very big, but -- I don't understand why you ask the

4    size, because a restaurant has one bathroom.

5    Q.  OK.  So it's one toilet, one sink, right?

6    A.  Yes.  The bathroom just has the toilet and sink, yes.

7    Q.  And so was Amma a busy restaurant?

8              THE INTERPRETER:  Please?

9    Q.  Were they busy?

10   A.  Yes.  Too much.

11   Q.  Too much?  So sometimes you, you --

12   A.  Yes, because when it was busy we had a lot of people.

13   Q.  Were there a lot of orders coming in, or just a few?

14   A.  It was too many people for the restaurant and many orders.

15   It was just as busy inside and outside, I mean the deliveries.

16   Q.  OK.  You had a bike, correct?

17   A.  Yes, because a restaurant, if I didn't have a bike, they

18   wouldn't give me the job.

19   Q.  Did somebody tell you they wouldn't give you a job without

20   the bike?

21   A.  Yes.

22   Q.  What's the furthest you had to make deliveries?  What was

23   the furthest distance by blocks?

24   A.  Well, it depended on where the client, actually, the ones

25   who actually placed the order, where this client was.  That's

F7RAROM1ps                    C. Romero - cross

1   the distance I had to go.

2   Q.   So what's the furthest you had to go to deliver?

3   A.   The furthest we would go, we would leave from 51st, we

4   would go all the way up to 85th.

5   Q.   And how long would a delivery of that take?

6   A.   Well, I don't have the exact time, because it's rather far

7   and then it depended on the traffic.

8   Q.   And how often would you have to deliver outside of a

9   ten-block radius?

10   A.   More than ten blocks.  That was every day.  We did

11   farther-way deliveries.

12   Q.   Did you take deliveries on the West Side?

13   A.   Well, we, we went all over, because it didn't have a limit,

14   you know.  I know that restaurant does have certain blocks

15   where they make deliveries.  But they were free.  They would

16   deliver anywhere.  They didn't have a limit.

17   Q.   So you would go uptown, downtown?

18   A.   Well, all over, you know.  There were even big deliveries

19   that had to be made, and they had to actually use a van.  They

20   would take a van to make the delivery.

21   Q.   Did you ever take the van and make deliveries?

22   A.   No.  No.  You know.  They would take some other person to

23   do that, because that delivery didn't happen all the time.  It

24   was now and then.

25   Q.   OK.  So I want to know about you personally.  Did you ever

F7RAROM1ps                          C. Romero - cross

1   have to go uptown -- you said 85th Street.  Did you ever have

2   to go downtown to make deliveries?

3   A.  Well, as I said, you know, we were all over.  You know, we

4   would have to go down to 38th and even down to 25th Street.

5   Q.  Did you ever deliver outside Manhattan?

6   A.  No.

7   Q.  So about how many deliveries did you make a day?

8   A.  I don't know, actually.  Every day was different.  Some

9   days we had many.  Other days we didn't have -- we had few.

10  But the least we did would be 25 to 30 deliveries.  That's the

11  minimum we did.

12  Q.  And what was the maximum?

13  A.  Well, I don't have any idea about the maximum.  You know,

14  for me it was individual.  I had to leave with the bicycle with

15  several bags.

16  Q.  Now, when you made these deliveries, you made more than one

17  delivery for trip?

18  A.  Yes.  There were several.  Well, if there was just one

19  delivery, I would just take one bag, but, you know, that was

20  almost impossible, because almost all the deliveries had

21  different deliveries.

22  Q.  OK.

23  A.  Each trip would have different deliveries.

24  Q.  And you only made deliveries during lunch and dinner hours;

25  is that correct?

F7RAROM1ps                      C. Romero - cross

1   A.  I don't understand that question very well.

2   Q.  Well, when did you make deliveries?

3   A.  During our work hours.

4   Q.  Did you make the deliveries when the kitchen was open for

5   lunch and the kitchen was open for dinner, or did you make them

6   also in between times when the kitchen was closed?

7           MR. CLARK:  Objection.  We haven't established whether

8   the kitchen was closed and if so for what time.

9           THE COURT:  Overruled.  You may answer.

10  A.  Well, I didn't understand the question very well, but in

11  terms of the kitchen being closed, you know, even though the

12  kitchen might be closed, we never took a rest.  You see, we ate

13  whenever we could, and if we had to make a delivery, we just

14  did it, any way we could.

15  Q.  Let me ask you this.  When was the kitchen open for lunch?

16  A.  You mean for the clients?

17  Q.  Yes.

18  A.  Well, I don't remember very well, but, you know, the

19  restaurant opened from 12 to 3 for lunch, and then later on it

20  opened at 5 p.m. and closed at 11.

21  Q.  So did you ever get orders for delivery which you had to

22  deliver between 3 and 5 when the kitchen was closed?

23  A.  Yes, several times.

24  Q.  So how were those orders prepared if the kitchen was

25  closed?

F7RAROM1ps                          C. Romero - cross

1   A.  Well, you know, they would make them before they actually,

2   the cooks, left for -- from the kitchen.  They would prepare

3   them before, when they got the orders.

4   Q.  So you could have been making deliveries any time from 12

5   p.m. in the afternoon to 11 p.m. at night?  Is that correct?

6   A.  If the deliveries were ready to take out.  However, if the

7   deliveries were delayed and we arrived later than that, then we

8   would have to take them out at any time that they were prepared

9   and ready to go.

10  Q.  Can you read English?

11  A.  No.

12  Q.  Can you understand spoken English?

13  A.  No.

14  Q.  Can you read Spanish?

15  A.  Yes.

16  Q.  Were you able to read the addresses for the delivery in

17  English?

18  A.  Yes.

19  Q.  Are you able to read street signs?

20  A.  Yes.

21  Q.  Are you able to read and comprehend a receipt for a

22  customer and collect cash payment if they paid in cash?

23  A.  Yes.

24  Q.  So you had enough of a basic understanding of English to be

25  able to perform those tasks.

1              THE INTERPRETER:  In order to?

2    Q.  Perform those tasks.

3    A.  You have -- I was just able to read the address.  Because

4    the numbers, whether the numbers are in English or in Spanish,

5    it's the same.

6    Q.  And how many days a week did you work?

7    A.  Six days.

8    Q.  And how long are your shifts?

9    A.  You want to know my term with regard to the hours?

10            Or my shift?

11            THE INTERPRETER:  Interpreter correction.

12   Q.  Your shift.

13   A.  From 11 o'clock during the day until 11 o'clock at night.

14   But we frequently would leave around 11:30 or 12 midnight.  It

15   depended on whether or not we had to clean the kitchen.  In

16   that case we would leave later.  If we really pressed ourselves

17   it would be possible perhaps to finish by midnight.

18   Q.  So, I'm sorry, I didn't get the first part of the answer.

19   You said "supposedly from 11 to 11"?

20            THE INTERPRETER:  I'm sorry, counselor.  I just, I

21   can't understand you.  I'm sorry.

22   Q.  The first part of the answer was "supposedly 11 to 11"?  Is

23   that what you said?

24   A.  I said supposedly our hours were to be from 11 to 11.

25   Those were the hours that we designated for our work.  But it

F7RAROM1ps                         C. Romero - cross

1    wasn't 11.  It was between 11:30 and 12, and two times a month

2    we would --

3              MS. KAFEDJIAN:  I'm sorry, your Honor.  I can't hear

4    the translation.

5    A.  We would press ourselves.

6              MS. KAFEDJIAN:  I think he is moving in that

7    direction.

8    A.  And however, if we were unable to finish by that time, it

9    could possibly be as late as 2 in the morning.

10             THE COURT:  I'm sorry.  Would you read back the

11   answer, please.

12             (Record read)

13   Q.  What do you mean the records designated 11 to 11?

14   A.  What I was referring to is that supposedly, according to

15   the restaurant, we were working from 11 to 11, but if we had

16   to, we would work later.

17   Q.  Did all the employees stay until 12?

18   A.  Not everyone.  Just we delivery boys, the dishwasher, and

19   the kitchen helper.

20   Q.  And what's the name of the kitchen helper?

21   A.  At first when I, when I first started, the first guy's name

22   was Eliseo.

23   Q.  And then?

24   A.  They also used a guy who was a delivery boy as well, whose

25   name was Cesar Chilogalli.

1    Q.   And Chilogalli was a kitchen assistant?

2    A.   Afterwards, yes.

3    Q.   And the dishwasher stayed as well?

4    A.   Yes.  He would stay till the end as well.

5    Q.   And your brother?

6    A.   Yes, as well.

7    Q.   Was there another delivery worker who stayed with you?

8    A.   The delivery boys, we were the ones that stayed.

9    Q.   Right.  I'm trying to find out how many delivery boys there

10   were that stayed until 12, 12:30 as you are alleging.

11   A.   There were three of us, plus the kitchen helper and the

12   dishwasher who stayed, who remained with us.

13   Q.   So how did you -- how would the restaurant lock up when you

14   left around 12, 12:30?

15   A.   A guy would remain behind who closed it up every day.

16   Q.   And who was this person?

17   A.   His name is Salvador.

18   Q.   And what did he do during the time you were cleaning?

19   A.   He would wait in the dining room where the clients ate

20   until we were finished.

21   Q.   And he did no work at that time?

22   A.   No.  He didn't do any work.

23   Q.   And what was Salvador's position at the restaurant?

24   A.   I don't know whether or not he was a chef or not or whether

25   he was a person on the same level as we were.  I just don't

F7RAROM1ps                        C. Romero - cross

1    know.

2    Q.  Well, what did he do during the day?

3    A.  Who?  He or me?

4    Q.  Salvador.

5    A.  He worked inside the kitchen.  He ordered the food.  He was

6    the one that ordered what was to be cooked.

7    Q.  So it was the kitchen assistant?

8    A.  I don't know how they call him.

9    Q.  When did the owners leave?

10           When did the owners leave?

11   A.  I don't understand that.

12   Q.  Well, do you know the two people sitting here at this

13   table?

14   A.  Yes.  Yes, of course.

15   Q.  When did they leave?

16   A.  When did they leave where?

17   Q.  At the end of the day.  When time did they leave?

18   A.  They left before 10 o'clock.

19   Q.  And who remained after 10 o'clock?  Was there a manager?

20   A.  The last one to leave was Salva.  I don't know more than

21   that.

22   Q.  You mean Salvador?

23   A.  Yes.  Salvador was the only one who remained.  There was

24   nobody else.

25   Q.  And he had keys.  Is that correct?

F7RAROM1ps                          C. Romero – cross

 1            Are you claiming that he had keys?

 2   A.  I didn't see that.  But he did have keys.

 3   Q.  So did you see him lock up when you left, or did you leave

 4   when he locked up?

 5   A.  Yes.  I –– yes, of course I saw him, because he was the one

 6   who remained, because he closed up.

 7   Q.  My question is, did you physically see Salvador lock the

 8   door to the restaurant and walk out?

 9   A.  Yes.

10   Q.  During your employment, what were your duties at the

11   restaurant?

12   A.  I was the delivery boy.

13   Q.  OK.  And how long did to take you to make deliveries?

14   A.  I don't know exactly.  There were some days we made

15   deliveries, some days we didn't.  When there were no deliveries

16   we worked inside.

17   Q.  Was there ever a day with no delivery?

18   A.  There was a day when –– well, I didn't have any deliveries

19   because I had to cover for the kitchen assistant.

20   Q.  Is that Salvador?

21   A.  No.  I helped, I helped the –– I helped cook.  Salvador was

22   an assistant.

23   Q.  So let me ask you, are you saying that there was one

24   particular day on which you made no deliveries because you

25   worked in the kitchen the whole day?

F7RAROM1ps                         C. Romero - cross

1   A.  Yes, because I was covering for the guy that was the

2   kitchen assistant.

3   Q.  Other than that day, was there any day you had without any

4   delivery?

5   A.  No.  There were no other days that I didn't do deliveries.

6   Q.  So you did deliveries during lunch and dinner, correct?

7   A.  Yes.

8   Q.  Uptown?  Downtown?  West Side?

9   A.  All over, yes.

10  Q.  What other things did you do at the restaurant besides

11  deliveries?

12  A.  We did everything inside.  We cleaned the basement, the

13  freezers.  We did everything.  We helped out with the

14  vegetables, shrimps.  If it was very busy, we had to help out.

15  We did everything.

16        THE COURT:  One moment.  I heard him say "when the

17  dishwasher was busy we would help."

18        THE INTERPRETER:  I stand corrected.

19  Q.  What would the dishwasher be busy doing, that required you

20  to do dishes?

21  A.  It -- if we got very busy, he couldn't move the dishes fast

22  enough and so help him move the dishes fast enough so that he

23  could be OK.

24  Q.  Did the restaurant have a full-time dishwasher?

25  A.  Yes.

F7RAROM1ps                     C. Romero - cross

1    Q.  And if they were so busy that he couldn't even keep up with

2    the dishes, weren't there also a lot of orders coming -- didn't

3    that mean there were also a lot of orders coming in?

4    A.  Yes.  What you have to realize is, you have to realize that

5    that might apply to the clients.  But in terms of the

6    deliveries that we were making, if we had the opportunity to

7    help him we would.

8    Q.  How many people worked in the kitchen?

9    A.  I don't know exactly.  There are three cooks and the

10   kitchen helper.  Well, I don't really remember exactly.

11   Q.  And the dishwasher as well?

12   A.  As well.

13   Q.  Was there possibly a fourth chef as well?

14   A.  I have no idea, because they helped each other out between

15   themselves, as well.

16   Q.  Well, how much time did you spend in the kitchen, per day?

17   A.  How much time?  I couldn't say exactly because we were

18   coming and going.

19   Q.  Were you working in the kitchen every day?

20   A.  That's what I was trying to explain.  We would go make

21   trips outside, and then we would also help in the kitchen.

22   Q.  So what I'm asking is, did you work in the kitchen every

23   day?

24   A.  Yes.

25   Q.  For about how long?

1   A.  I didn't know exactly how long, because we had to make the

2   deliveries and then we would return to the kitchen.

3   Q.  So you worked every day in the kitchen for five years?

4   A.  Yes.

5   Q.  How many people were in the kitchen that you saw them every

6   day?

7   A.  There were the three cooks, the guy that handed out or

8   delivered the plates, there was the dishwasher, and us.

9   Q.  So there were six people other than the delivery boys

10  working full time in the kitchen?

11  A.  That's the way it was, yes.

12  Q.  Every day.

13  A.  Every day, unless someone was absent on a certain day.

14  Q.  Now, when you -- at the times you worked in the kitchen,

15  did you work with the other delivery boys in the kitchen, or

16  were you by yourself?

17  A.  I don't understand that question exactly.

18  Q.  At the times you worked in the kitchen, were you the only

19  delivery boy working in the kitchen, or did you work with other

20  delivery boys in the kitchen?

21  A.  Yes.  I was the only one covering for the assistants.

22  Q.  So was the only time you work in the kitchen when you were

23  covering for someone, or are you saying you worked in addition

24  to the kitchen staff in the kitchen?

25  A.  What I'm saying is that there was a single day when I

F7RAROM1ps                    C. Romero - cross

1  traveled -- when I worked purely in the kitchen, but on other

2  days I would work part of the time in the kitchen and we

3  delivery boys would also make our deliveries as well.

4            THE COURT:  All right.  So I have a question.  When

5  you were told to make a delivery and you returned to the

6  restaurant, let's assume there were no further deliveries.

7  What did you do?

8            THE WITNESS:  Help with the cooks, with whatever they

9  needed, or I would clean the freezer, or I would clean the

10 basement or whatever needed to be done.

11 Q.  And who would instruct you to do these things?

12 A.  The one who instructed us personally to do them was

13 Salvador.  But the ones who actually gave the orders for work

14 to be done were the owners.

15 Q.  How do you know it was the owners that gave the orders?

16 A.  Because they were there.  Sometimes they would give us

17 orders but we wouldn't be able to understand what they were

18 saying.  And so Salvador would explain to us.

19 Q.  OK.  So what's the first thing you did when you came to the

20 restaurant?

21            THE COURT:  Did Salvador speak English?

22            THE WITNESS:  Yes.  He spoke English.

23            THE COURT:  You may re-ask the question.

24 Q.  What was the first thing you did in the restaurant when you

25 came in in the morning?

F7RAROM1ps                    C. Romero - cross

1           THE INTERPRETER:  What was the first thing you did in

2    the restaurant?

3    Q.  In the restaurant when you came in in the morning.

4    A.  We had to clean when we arrived.  For example, for me, I

5    had to clean up the dining room, the upholstery, the cushions,

6    things like that.  Water down the -- wash down the sidewalk,

7    wash down the bathrooms.  That we -- we would do that between

8    us delivery boys.

9    Q.  OK.  So what I'm asking you, between 11 or a little later

10   when you came in in the morning until 12 o'clock, when lunch

11   began, what did you do in that hour?

12   A.  As I was arriving, we would clean up the dining room, and

13   then we would do deliveries.

14   Q.  So the only thing you did in the morning was clean up the

15   dining room?

16   A.  That was the only thing that I did upon arriving.

17   Q.  Did you ever clean the bathroom?

18   A.  Afterwards, we made the deliveries.  And if we didn't have

19   any deliveries left to do, we would clean inside, that being

20   the kitchen or the basement.  We would have to be aware of

21   whether or not there were boxes to take apart or garbage that

22   had to be taken out.  We did everything.

23   Q.  What I'm asking is, in the morning, the first hour in the

24   morning, let's go step by step through your day.  What did you

25   have to do in that first hour?

F7RAROM1ps                        C. Romero - cross

1    A.  What I had to do upon arriving was to vacuum the dining

2    room.

3    Q.  OK.  So that's the only thing you did in the morning.

4    Correct?

5    A.  Yes.  When I -- upon arriving there, that was the only

6    thing that I had to do.

7    Q.  And then the restaurant opened for lunch at 12, correct?

8    A.  Yes.

9    Q.  And between 12 and 3, did you make deliveries?

10   A.  Yes.

11   Q.  Now, how would you get an order for delivery?  How would

12   the order be given to you?

13   A.  They communicate to -- they didn't communicate the orders

14   to us.  If there were deliveries that came in when we weren't

15   there, they would call us on the phone.

16   Q.  And when you were there?

17   A.  If we were there at the place, they would tell us that

18   there were deliveries and we had to do them.  If we were in the

19   basement they would call us up.

20   Q.  So the three of you worked during 12 and 3 to make

21   deliveries for the restaurant, correct?  The three delivery

22   boys.

23   A.  Yes.  The start of deliveries was at that time.

24   Q.  OK.  And sometimes if you were so busy they would bring in

25   somebody from the kitchen to help you do deliveries.  Is that

F7RAROM1ps                      C. Romero - cross

1    correct?

2    A.  Yes.  If we were using -- if we became very busy, yes.

3    Q.  So lunch closed at 3.  What did you do between 3 to 5?

4    A.  The restaurant closed at 5 but we continued to work because

5    we had to clean the kitchen and there were other things that we

6    had to do at that hour.

7    Q.  You cleaned the kitchen between 3 and 5?

8    A.  Yes.

9    Q.  The whole two-hour period?

10   A.  Yes.

11   Q.  Were you alone or did someone help you clean the kitchen

12   from 3 to 5?

13   A.  It was the delivery boys, the three of us.

14   Q.  So the three of you cleaned the kitchen between 3 and 5?

15   A.  That's how it was, yes.

16   Q.  And what kind of things did you do in the kitchen when you

17   cleaned, the three of you?

18   A.  We had to throw out the folders -- the carpet.

19            THE INTERPRETER:  I got it.  OK.  Sorry.

20   A.  We had to clean the carpet, water down, or wash it down if

21   it were possible.  And it wasn't just clean the kitchen.

22   Besides that, I had to clean the dining room as well.

23   Q.  So between -- please, let's be clear.  You're saying

24   between 3 and 5 you had to clean the kitchen and the dining

25   room, or just the kitchen?

F7RAROM1ps                    C. Romero - cross

1    A.   Yes.  Yes, of course, because before the clients were to

2    come in, we had to leave the dining room clean for them.

3    Q.   OK.  So did the other delivery boys help you clean the

4    dining room as well?

5    A.   We did exactly the same thing that we did at the hour when

6    we arrived.

7    Q.   Which is vacuuming the dining room.

8    A.   Yes, use the vacuum, clean the bathroom, water down the

9    sidewalk, exactly what we did upon first arriving so that

10   things would be ready for 5 in the afternoon.

11   Q.   So between 3 to 5, did *you* clean the bathroom as well?

12   A.   As I said, we shared the work.  I used the vacuum.

13   Q.   I don't want to know about what you shared.  I want to know

14   about you personally, Carmelo Romero, what did you do between 3

15   to 5?

16   A.   I had to clean the dining room.

17   Q.   So you vacuumed the dining room?

18             So you vacuumed the dining room?

19   A.   Yes.  Yes.

20   Q.   Did you personally, Carmelo Romero --

21   A.   I vacuumed the dining room.

22   Q.   -- vacuum the kitchen between 3 and 5?

23   A.   Yes.

24   Q.   So for two hours you worked in the kitchen and vacuumed the

25   dining room.  Was there anything else you did personally?

F7RAROM2ps                       C. Romero – cross

1    A.   Just clean up the inside of the kitchen and clean the
2    dining room.
3    Q.   OK.  So we're clear.  Now, where was the kitchen staff when
4    you were cleaning the kitchen?
5    A.   I don't understand that.
6    Q.   You testified earlier there were five to six people working
7    in the kitchen, is that correct, other than the delivery boys?
8    Where were they when you were cleaning the kitchen between 3
9    to 5?
10   A.   They would –– yes.  They would leave at 3 in the afternoon
11   in order to rest up, and that was when we cleaned the inside.
12   Q.   Even the dishwasher?
13   A.   He would just finish up whatever dish-washing had to be
14   done, and then he would leave as well.
15            THE COURT:  All right.  We have come to 11:20.  We
16   will take a break until 11:50.
17            (Recess)
18            THE COURT:  The witness may resume the stand.
19   CARMELO ROMERO, Resumed.
20            THE COURT:  Remember, sir, that you are still under
21   oath.
22            THE WITNESS:  Yes.
23            THE COURT:  You may be seated.
24            You may inquire.
25   CROSS EXAMINATION (Cont'd)

F7RAROM2ps                    C. Romero – cross

1    BY MS. KAFEDJIAN:

2    Q.  So between the hours of 3 to 5 when you cleaned the kitchen

3    and vacuumed the dining room, where were the waiters?

4    A.  You're trying to ask where were the waiters between the

5    hours of 3 and 5?

6    Q.  Yes.

7    A.  They went out to eat in the dining room or just rested.

8    Q.  And when exactly did you vacuum the dining room?

9    A.  Before 5.  20 minutes before 5.

10   Q.  So you vacuumed the dining room for 20 minutes?

11   A.  Approximately that time, yes.

12   Q.  And how long did to take you to vacuum in the morning

13   before lunch?

14   A.  The same.  I did the same thing.

15   Q.  For the remainder of the time between 3 to 5, you said you

16   cleaned the kitchen?

17   A.  Yes.

18   Q.  Did you take any breaks?

19   A.  No.

20   Q.  So you cleaned the kitchen for an hour and 40 minutes?

21   A.  Well, how could I explain to you?  If we had a delivery, we

22   still had to do it, and if we had something else that we didn't

23   have time to do it before, then we would do it at that time.

24   Q.  I'm asking you, between the time from 3 to 5, did you make

25   any deliveries from 3 to 5?

F7RAROM2ps                         C. Romero - cross

1   A.  Well, I said that if we didn't have time to make all the

2   deliveries and that delivery was ready, then we would do it.

3   Q.  Were there any deliveries ready between 3 to 5?

4   A.  Sometimes, yes.

5   Q.  OK.  So when you were not making deliveries between 3 to 5,

6   you cleaned the kitchen.

7   A.  Yes, that's right.

8   Q.  Now, where was the kitchen staff between 3 to 5?

9   A.  Well, the kitchen staff, that's what they call the lunch

10  hour.  They would leave.

11  Q.  So there was no one in the kitchen with you when you were

12  cleaning between 3 and 5?

13  A.  Nobody else but the ones who were cleaning.

14  Q.  And who were the ones that were cleaning?

15  A.  We, the delivery people.

16  Q.  Were all three of you cleaning in the kitchen between 3

17  to 5?

18  A.  Yes.

19  Q.  Did anybody else help you vacuum the dining room between 3

20  to 5?

21  A.  We've always doing something else and another person would

22  vacuum.

23          THE COURT:  So when is it that you cleaned the

24  basement, cleaned the freezer, and cleaned the sidewalk?

25          THE WITNESS:  We would do that during the working

F7RAROM2ps                          C. Romero - cross

1    hours, maybe between 11 and 3.  If we didn't have any

2    deliveries, that's what we had to do.

3    Q.  Did you clean the sidewalk?

4    A.  Yes.

5    Q.  Every day?

6    A.  If I didn't do it, somebody else would do it, but from the

7    delivery people.

8    Q.  OK.  So when I'm asking you questions, Mr. Romero, I would

9    like to know what you personally did.  Did you personally clean

10   the sidewalk?

11   A.  Sometimes I did.

12   Q.  How often?

13   A.  I have no idea.  Like I was saying, sometimes I would do it

14   or somebody else would do it.

15   Q.  But how many times did you clean the sidewalk?

16   A.  Well, the sidewalk washed down regularly twice a day, two

17   times a day.

18           THE COURT:  At what time?

19           THE WITNESS:  When we arrived before opening the

20   restaurant, and then before 5.

21   Q.  So at what time did you personally clean the sidewalk?

22   A.  Well, for example, if the other people had not finished

23   doing whatever they were supposed to do when I finished

24   vacuuming, then I would go and do the washing.

25   Q.  And you mean, other people, you mean the other delivery

F7RAROM2ps                         C. Romero - cross

1   person?

2   A.   Yes, the delivery boys, and the ones who did the same work

3   I did.

4   Q.   Between 3 to 5, did the kitchen staff help clean or did the

5   wait staff help clean?

6   A.   No.  They didn't do anything like that.

7   Q.   The waiters didn't help you move the tables when you

8   vacuumed?

9   A.   No.

10  Q.   So you vacuumed alone?

11  A.   Well, alone, you know, we actually vacuumed and we moved

12  the tables, but the waiters didn't do that type of job.

13  Q.   OK.  So were you ever in the kitchen, working in the

14  kitchen between 12 and 3 or between 5 and 10 when lunch and

15  dinner was being served?

16  A.   Yes.

17  Q.   For what period of time?

18  A.   When we didn't have deliveries, we had to be in the kitchen

19  and doing things for the cooks.

20  Q.   And you were in the kitchen with the five or six other

21  kitchen employees that were there?

22  A.   Yes, that's right.

23  Q.   Was it a big kitchen?

24  A.   Not very big.

25  Q.   Did it fit seven people working?

F7RAROM2ps                        C. Romero - cross

1    A.  We were more than seven people.

2    Q.  How many people working in the kitchen?

3    A.  I don't know exactly, but more than seven people.

4    Q.  Well, count them out for me.  Who were the people?  You

5    said the three chefs.  You said there was a dishwasher.  You

6    said there was a kitchen assistant.  That's five.  Who else?

7    A.  The helper.  The one who did the runs for the food, or the

8    orders.  The washer.  And the delivery boys, us, also.

9    Q.  So there were 11 people in that kitchen?

10   A.  Not all the time.

11   Q.  So were there, at any point, 11 people working in that

12   kitchen?

13   A.  No.  I don't believe so.  Because we delivery boys, we came

14   in and out.

15   Q.  What does that mean, you came in and out?  Does that mean

16   you didn't stay in the kitchen?  You just brought something and

17   left?

18   A.  Well, if we had deliveries, then we were outside, but if we

19   did not have deliveries, we were inside.  But --

20   Q.  I want to understand about the time you're inside.

21   A.  When we were inside, it's because we were doing something.

22   We were not going in and coming out.

23   Q.  So when you were inside, were all three of you inside at

24   the same time, working?

25   A.  Not all three at the same time.

F7RAROM2ps                          C. Romero - cross

1          THE COURT:  The deliveries, did all of the delivery

2    workers leave the restaurant at the same time and return to the

3    restaurant at the same time, when making every delivery?

4          THE WITNESS:  No, no.  We actually changed according

5    to the deliveries to be made.

6          THE COURT:  So it varied.

7          THE WITNESS:  Yes.  Yes, it varied.  Sometimes I was

8    inside and sometimes some other person was inside.

9    Q.  I understand that.  What I'm trying to find out is, at

10   most, how many people were standing in that kitchen, are you

11   claiming?

12         THE INTERPRETER:  Excuse me, what was it?

13         MS. KAFEDJIAN:  What he's claiming, at most.

14   A.  I don't know exactly.  But it was ten to 11 people.

15         MS. KAFEDJIAN:  Your Honor, I would like to mark this

16   as H, Defendant's H.

17         THE COURT:  Has the plaintiff seen that?

18         MS. KAFEDJIAN:  No.

19         THE COURT:  We don't have surprise exhibits, counsel.

20   This is not the way we do it here.  What more surprises do you

21   have for us?

22         MS. KAFEDJIAN:  It's not intended to be a surprise.

23   It's intended to impeach the witness, your Honor.  He's

24   claiming that there's 11 people standing in the kitchen.

25         THE COURT:  I don't buy this.  I think that it's very

F7RAROM3ps                    C. Romero - cross

1   clear that you planned from the very beginning to submit these

2   documents.  I don't buy it.  I don't buy it.  So what we're

3   going to do right now, we're going to take a break.  We need to

4   take a break.  You need to show all these exhibits to the

5   plaintiffs.  I'm not having ambush trial practice.

6          MS. KAFEDJIAN:  This is the only new exhibit.

7          THE COURT:  That's it?

8          Counsel, do you need time to review the exhibit?

9          MR. CLARK:  Yes, your Honor.

10          THE COURT:  All right.  We're taking a break.

11          (Recess)

12          THE COURT:  Let me start by drawing your attention to

13   plaintiff's proposed findings of fact and conclusions of law.

14   And I'm looking at paragraph 10.  It says, "However, throughout

15   his employment, plaintiff Carmelo Romero spend over two hours

16   per day performing non-delivery worker duties, including but

17   not limb towed to various restaurant duties such as peeling

18   shrimp, cutting vegetables, sweeping and mopping, washing

19   dishes, cleaning the basement, the bathroom, the kitchen, the

20   walls and the freezer, taking out the garbage, ripping apart

21   cardboard boxes," etc.  This is also paragraph 4 of the amended

22   complaint.  It goes on to say "cleaning the oven vents in the

23   kitchen and cleaning the seating area."

24          The affidavit of Devendra Sharma, dated April 27, 2015

25   paragraph 14, states, "Furthermore, the kitchen itself only has

F7RAROM3ps                      C. Romero - cross

 1   room for the six aforementioned kitchen employees, and so there

 2   was no feasible way plaintiffs could simultaneously occupy any

 3   kitchen space in order to perform the non-tipped duties alleged

 4   over the length of time alleged."

 5          And so you approach the witness, you hand him a

 6   photograph of the kitchen.  You hand those photographs up to

 7   me.  And the purpose you say is for impeachment.  The idea is

 8   that you introduce these photographs to me and try to persuade

 9   me that the kitchen cannot accommodate the amount of people

10   that the witness states that it did accommodate.  And that's

11   not just a backdoor way of introducing these photos.  You knew

12   you were going to do it all the time.  And this is what we call

13   sharp practice.

14          Go ahead.

15          MS. KAFEDJIAN:  I apologize, your Honor.

16   BY MS. KAFEDJIAN:

17   Q.  So when you worked in the kitchen between 3 to 5, where was

18   the kitchen staff?

19   A.  They were outside.  They were out during the lunchtime.

20   Q.  So none of the kitchen staff stayed to clean in the

21   kitchen, during that time?

22   A.  No, just the delivery boys.

23   Q.  And the kitchen assistant?

24   A.  Yes, also.

25   Q.  So four people cleaned the kitchen.  Correct?

F7RAROM3ps                         C. Romero - cross

1    A.  Four, and the dishwasher finished whatever he had to do.

2    Q.  And during the time when the kitchen was operating between

3    12 and 3 and 5 and 10, did you work in the kitchen?

4    A.  As I was saying, I didn't exactly work in the kitchen.  We

5    were in, if we did not have deliveries, that's when we went to

6    the kitchen.  Otherwise we did not.

7    Q.  But when you did not have deliveries you worked in the

8    kitchen?

9    A.  If we had no deliveries, we had to work inside or we had to

10   do something else, or otherwise we went to the basement to do

11   something else.

12   Q.  You claim in your trial declaration that you peeled shrimp,

13   cut vegetables, cleaned the kitchen, prepared sauces, washed

14   dishes, cleaned and stocked the kitchen; those were all duties

15   in the kitchen.  Correct?

16           THE INTERPRETER:  What was the end of the question?

17   Q.  Those were all duties performed in the kitchen, correct?

18   A.  Yes, that's right.

19   Q.  So when you performed those duties, you were in, physically

20   standing in the kitchen, correct?

21   A.  Yes.

22   Q.  So is it your testimony today that up to 11 people were

23   standing in the kitchen as is depicted in the photographs in

24   front of you?

25   A.  But I didn't say that 11 people could be in there.

F7RAROM3ps                      C. Romero - cross

1   Q.   What did you say?

2   A.   Well, I said that supposedly 11 people could be in the

3   kitchen, but they weren't there a long time.  They weren't

4   there all the time.  We went in and out.

5   Q.   So there were 11 people -- what was the maximum amount of

6   people working in this kitchen at any time when you were

7   working?

8   A.   Well, the maximum, there was the four cooks, and also the

9   one who came in and went out with the food --

10         THE INTERPRETER:  Your Honor, the interpreter will

11   have to have the witness repeat the answer.

12         The entire answer -- the interpreter thinks that she

13   missed something, so she's asking the witness to repeat.

14   A.   Then three people, the only people that worked inside were

15   the three cooks, the kitchen helper, and the dishwasher, one

16   who makes the food runs, and then the one who does the dishes.

17   Those are the ones that were in there.

18   Q.   And then you were in there with them when you were peeling

19   shrimp, preparing sausage, cutting vegetables, washing dishes,

20   and cleaning and stocking the freezer?

21   A.   Well, you have to really take into consideration that we

22   were only in there when we had no deliveries.  That means that

23   we changed all the time.

24   Q.   I understand you changed.  But I'm trying to understand,

25   even if all three of you weren't in there at the same time, at

F7RAROM3ps                        C. Romero - cross

1   least one of you was in there, according to your testimony

2   today, with the kitchen staff helping.

3   A.  Yes, that's right.  One of us was there.

4   Q.  OK.  You claimed your in trial declaration that you

5   prepared sauces?

6           THE INTERPRETER:  You prepared?

7   Q.  Sauces.  Sauce.

8   A.  Well, yes, the sauce, the one they used for deliveries.  We

9   used to prepare that, yes.

10  Q.  What do you mean, the ones used for deliveries?

11  A.  Well, you know, like the sauce that all the dishes for

12  delivery have to have, for example, you know, the dressing that

13  you have to put on them.

14  Q.  Do you have any culinary experience in Indian cooking?

15  A.  No, I don't have any experience, but they taught us how to

16  make the sauces.

17  Q.  OK.  What kind of sauces did you make?

18  A.  Well, there was a green sauce, a white sauce, and a

19  tamarind one.

20  Q.  And what, do you know the ingredients that went in those

21  sauces?

22  A.  The green sauce, we knew how do it, we did it.  We just had

23  to put the ingredients in the blender, and then we put in the

24  little containers.

25  Q.  And the remaining sauces?

F7RAROM3ps                    C. Romero - cross

1   A.  The cooks would prepare it, and then we just grind the

2   ingredients, and then we would put them in, and put it in

3   little containers.

4   Q.  So none of this was cooked.

5   A.  Not the green sauce.  And the white one neither.

6   Q.  And these were prepared for which types of orders?  The

7   delivery orders?

8   A.  For the deliveries, for the ones that had to be taken, for

9   everything.

10  Q.  So those were sauces that went into the delivered packages.

11  A.  The ones that we put in the containers, yes.

12  Q.  Those are to-go packages.  Correct?

13  A.  Yes.

14  Q.  OK.  How often did you wash dishes?

15  A.  I didn't wash dishes.  I didn't say that.  I just said that

16  we helped the dishwasher.

17  Q.  You didn't say that you washed dishes?

18  A.  No.  I, I didn't say that I washed dishes.  I said that we

19  helped.

20  Q.  So there was a full-time dishwasher?

21  A.  Yes.

22         MS. KAFEDJIAN:  Does he have his trial declaration in

23  front of him?

24         MR. CLARK:  He should have a copy.

25  Q.  In paragraph no. 5, in the third sentence, you claim to

F7RAROM3ps                        C. Romero - cross

1   wash dishes.

2   A.  I don't understand.

3           THE COURT:  All right.  So would the interpreter

4   please translate for him paragraph 5.

5           THE INTERPRETER:  Thank you.

6           (Pause)

7   A.  I understood.

8   Q.  OK.  So is that statement incorrect, that you washed

9   dishes?

10  A.  Well, it's not incorrect, because I say that to wash dishes

11  and to help the dishwasher is the same thing.

12  Q.  You claim that you cut vegetables.

13  A.  Yes, that's right.

14  Q.  You did this in the kitchen during the hours of lunch and

15  dinner?

16  A.  Yes.

17  Q.  And how long did that take?

18  A.  I don't -- I don't really have an exact time because, for

19  example, if I was cutting an onion and I had to make a

20  delivery, then I would leave to make the delivery.

21  Q.  Now, what types of duties did you perform after dinner and

22  the deliveries were complete?

23          MS. KAFEDJIAN:  Withdrawn.  Let me ask one more

24  question because this wasn't on the record before.

25  Q.  Until what time did you make deliveries to?

F7RAROM3ps                          C. Romero - cross

1           THE INTERPRETER:  "You" singular or plural, please?

2    Q.  You, personally, Carmelo Romero, make deliveries.

3    A.  If we didn't finish making the deliveries before 11, or if

4    there was one pending and we had to do it after 11, we did.

5    Q.  So until 11:30 p.m.?

6    A.  Yes.  Well, we made the delivery, and to be able to go back

7    to the restaurant, possibly, yes.

8    Q.  And what did you do after the deliveries were complete?

9    A.  If the kitchen had not been completely cleaned, then I

10   would help to clean.

11   Q.  Well, who was responsible for cleaning the kitchen?

12   A.  Excuse me?

13   Q.  Who was responsible for cleaning the kitchen?

14   A.  Well, there was no person who was responsible among us,

15   but, you know, after we had cleaned, the person who was going

16   to lock, then after we had finished he would lock.

17   Q.  So you're telling me that no one on the kitchen staff

18   cleaned the kitchen at any point during the day?

19   A.  They couldn't work in the kitchen?  No.  The only ones who

20   cleaned were us, the delivery boys, and the kitchen helper.  We

21   were the ones who did it, nobody else.

22   Q.  So at the end of the night, besides cleaning the kitchen,

23   did you have to take out the garbage?

24   A.  If I didn't take it out, then another person would, but,

25   yes, we took it out every single day.

F7RAROM3ps                         C. Romero - cross

1   Q.  I am asking the witness the question of what he personally

2   did.  How many times did you personally take out the garbage

3   every day?

4   A.  Well, as I said, I didn't take out the garbage every single

5   day, but if the person who was supposed to take out the garbage

6   didn't do it, then I helped.

7   Q.  Who was the person who was supposed to take it out?

8   A.  One of us is the one who would take out the garbage.

9   Sometimes we just helped each other and helped among us.

10  Q.  Did your brother take out the garbage?

11  A.  Yes, also.

12  Q.  Did he do it regularly?

13  A.  No, not regularly.  We just changed sometimes.

14  Q.  So your brother did not take out the garbage every day?

15  A.  Not, no, not -- well, he, he didn't take it out all the

16  time.  What he did, you have to take into consideration that we

17  actually changed.  Because if we had a new delivery person and

18  that person came in, then he was the one in charge of taking

19  out the garbage.

20  Q.  So there was a seniority issue?

21  A.  Something like that, yes.

22  Q.  Whoever the newest employee was was responsible for taking

23  out the garbage?

24  A.  Not exactly responsible, but then he was the person who was

25  helping us in the kitchen and, yes, then he would leave.

F7RAROM3ps                    C. Romero - cross

1   Q.  Did you also have to rip up boxes at the end of the night?

2   A.  If there were more boxes and we didn't have time during the

3   day, yes, we did.

4   Q.  Did you have to clean the basement?

5   A.  Yes.  We had to clean it because if we actually left it

6   dirty or with some boxes, then the owner, the female owner,

7   would come and be upset with us.

8   Q.  When did you clean the basement?

9          THE INTERPRETER:  "You" singular or plural?

10  Q.  You, Carmelo Romero.

11  A.  Well, regularly almost all the time.

12  Q.  You mean every day?

13  A.  Yes.

14  Q.  And when did you do this?  At what point, in your day?

15  A.  During the time we had no deliveries we would do it.

16  Q.  So when you had no deliveries, you worked to clean the

17  kitchen, peel shrimp, cut vegetables, prepared sauces, stocked

18  the freezer, cleaned the basement, vacuumed the dining room,

19  helped the dishwasher.  When did you have time to make

20  deliveries?

21  A.  That's what we did when we weren't -- when we didn't have

22  deliveries to make.

23  Q.  You also claim, Mr. Romero, that you cleaned the oven vents

24  in the kitchen?

25          THE INTERPRETER:  The oven?

1          MS. KAFEDJIAN:  Oven vent, v-e-n-t, vent.

2     A.  Yes.

3     Q.  And how often did you do that?

4     A.  When you referred to grills, I didn't quite understand

5     that.  When I, when I'm referring to the apron in the kitchen,

6     the covering apron in the kitchen.

7          MS. KAFEDJIAN:  I would like to refer the witness to

8     page 5 of his trial declaration, the last line.

9     Q.  It says "cleaning the oven vents in the kitchen."  That's

10    what I'm asking about.

11    A.  I understand now.

12    Q.  When did you perform this duty?

13    A.  We didn't do it all the time.  We did it about twice a

14    month.  I couldn't get it down exactly.  We didn't actually do

15    it all of the time, but what we cleaned was the hood, the hood,

16    and the burners.

17    Q.  And when you had performed this duty, were the other

18    delivery workers with you?

19    A.  Just the delivery boys.

20    Q.  And are you claiming that you stayed until 2 or 3 in the

21    morning performing these duties twice a month?

22    A.  Not exactly.  If we -- if we pressed ourselves, we might

23    have been able to finish it before, but if it was a question of

24    that hood, yes, we would finish late.

25    Q.  "Late" being 3 in the morning?

F7RAROM3ps                          C. Romero - cross

1    A.  Not at 3 in the morning, no.  It would be -- it would

2    depend upon how quickly we were able to do it.

3    Q.  So how late did you stay on the days you were cleaning the

4    vents?

5    A.  I couldn't say exactly, but maybe up until 12:30, 1 o'clock

6    in the morning.

7    Q.  Did you ever claim that you stayed until 2 or 3 in the

8    morning cleaning vents?

9    A.  It's possible that we would have stayed that late, but as I

10   said before, it depended on how quickly we were able to work.

11   Q.  Let me ask you specifically, did you ever stay until 2 or 3

12   in the morning cleaning vents?

13   A.  Yes, sometimes.

14   Q.  And how many times did that happen?

15   A.  I couldn't say exactly, but, yes, on certain occasions we

16   did remain later.

17   Q.  So you and the other delivery boys, on at least some

18   occasions, you were claiming, stayed until 2 or 3 in the

19   morning cleaning oven vents.

20   A.  Yes.

21   Q.  And was anyone else present in the restaurant with the

22   delivery boys when you would stay up these nights until 3 a.m.?

23   A.  You want to know whether somebody else was there?

24   Q.  Besides the three delivery boys.

25   A.  Just the kitchen assistant.

F7RAROM3ps                         C. Romero - cross

1    Q.  What's his name?

2    A.  As I explained to you previously, the first one was named

3    Eliseo, and later on it was Cesar.

4    Q.  What was the first one's name?  I'm sorry?

5    A.  Eliseo, E-l-i-s-e-o.

6    Q.  And did either Eliseo or Caesar help you clean the vents?

7         THE INTERPRETER:  Clean the?

8    Q.  Oven vents.

9    A.  Yes.

10   Q.  So four of you cleaned the oven vents until 3 in the

11   morning, on some occasions.

12   A.  On some occasions.

13   Q.  Do either Eliseo or Caesar have keys to the restaurant?

14   A.  I never noticed that they had keys.

15   Q.  So who locked the restaurant when you left at 3 in the

16   morning?

17   A.  I didn't say that on certain occasions we left at 3 in the

18   morning.

19   Q.  Oh, so now you didn't say that?

20   A.  But I didn't say until -- I didn't say until 3 at night.

21   That depended.

22   Q.  I specifically asked you -- we can have the reporter read

23   it back -- what is the latest you stayed when you and the

24   delivery boys clean the oven vents.

25   A.  Yes.  Sometimes we remained that late.

F7RAROM3ps                         C. Romero – cross

 1   Q.   So did you remain until 3 in the morning on some occasions

 2   or did you not?

 3   A.   Not until 3 in the morning.  I believe it was 2 in the

 4   morning.

 5   Q.   Did you ever claim in your deposition that you stayed until

 6   2 or 3 in the morning?

 7   A.   It depended on how fast we were working.  If we didn't work

 8   fast, yes, on some occasions we stayed.

 9   Q.   Until 3 in the morning.

10   A.   Possibly, yes, if we didn't work fast.

11   Q.   So I ask you again.  When you stayed with the kitchen

12   assistant, the three delivery boys and the kitchen assistant,

13   either Eliseo or Caesar, who closed the restaurant at 3 in the

14   morning?

15   A.   As I said before, if we worked quickly, it would be before

16   then.  If we didn't work quickly, possibly, due to all of the

17   time that we were cleaning, that we would not leave until 2 or

18   3 in the morning.

19   Q.   You're not answering my question.  My question was, who

20   locked the restaurant when you left at 3 in the morning?

21   A.   Salvador was the one that closed it.

22   Q.   So where was Salvador when you were cleaning until 3 in the

23   morning?

24   A.   He was in the dining room.

25   Q.   So he waited in the dining room until 3 in the morning?

F7RAROM3ps                         C. Romero - cross

1    A.  He waited until we finished the job.

2    Q.  So he sat in the dining room for three hours and did

3    nothing until you finished cleaning the oven vents?

4    A.  Well, it's not as though we knew exactly what he was doing.

5    We were in the kitchen.  He was in the dining room.  We didn't

6    know exactly where he was.

7    Q.  Let me ask you this.  Who's Kiran?

8    A.  Kiran supposedly is the manager.

9    Q.  Does Kiran close the business regularly?

10   A.  Sometimes he closes, sometimes it's Salvador, but generally

11   speaking it's Salvador.

12   Q.  Isn't it true that Salvador only closes on Tuesday, which

13   is Kiran's day off?

14   A.  I don't understand.

15   Q.  Does Kiran close and lock up the restaurant every day

16   except Tuesday, his day off?

17   A.  Normally it's only he and Salvador who close the

18   restaurant, but in general, normally, it's Salvador who closes

19   the restaurant.

20   Q.  So Kiran doesn't close the restaurant, on a regular basis,

21   except for Tuesday.  That's your testimony here today.

22           MS. KAFEDJIAN:  Do you have --

23           THE INTERPRETER:  Is that the question?

24           MS. KAFEDJIAN:  Yes, it's a question.

25   Q.  So your testimony here today is that Kiran does not close

F7RAROM3ps                    C. Romero - cross

1    or lock up the restaurant at the end of the night on a regular

2    basis except for Tuesday?

3              MR. CLARK:  Objection.  I think the only time --

4              THE COURT:  Sustained.  Sustained.

5    Q.  During your employment, did you earn tips for your

6    deliveries?

7    A.  The only time I gained -- I earned tips was when it was

8    paid in cash, not when it was paid with a credit card.

9    Q.  So you didn't earn credit-card tips?

10   A.  From credit cards, everything that had to do with credit,

11   yes.

12   Q.  OK.  So you received cash and credit-card tips.

13   A.  Well, the only was, for credit cards -- I mean, I don't

14   know, you know, quite how to put it, but it was when they

15   signed off on the receipt.

16   Q.  OK.  So let's go through each one of the cash tips you got

17   directly from customers when you made a delivery.  Correct?

18   A.  Yes.

19   Q.  And credit-card tips, would you cash that out daily, with

20   the cashier?

21   A.  The ones that are put down directly on the slip by the

22   client, I imagine that those are by credit card.  It's not

23   cash.

24   Q.  So you got those daily, right?

25   A.  Only on days when there were those.  There were days when

F7RAROM3ps                           C. Romero - cross

1   there were none of those.

2   Q.  So on days that you did deliver credit card orders, you

3   would go to the cashier and cash out those credit-card tips,

4   correct?

5   A.  Yes.

6           THE COURT:  Are you claiming when you make the -- you

7   asked a question about credit-card payments.  Are you including

8   Internet sales?

9           MS. KAFEDJIAN:  Not yet.  I'm getting to that.

10  Q.  Did you receive Seamless tips?

11  A.  No, never.

12  Q.  Did you ever sign a receipt, every week, acknowledging that

13  you received Seamless tips?

14  A.  I just don't understand the last part of what you're asking

15  me.

16  Q.  OK.  We'll get back to that.  Let's continue with this.

17  What percentage of your deliveries were from cash tips?  I'm

18  sorry.  What percentage of your tips came from cash?

19  A.  I don't know exactly, because there were some days when

20  that was so and others when it wasn't.

21  Q.  I'm just trying to get at what percentage of your tips were

22  cash and credit.  Was it more Seamless or was it more cash and

23  credit?

24  A.  Comparing it with Seamless, the most, the largest amount

25  that resulted was from cash and credit.

F7RAROM3ps                    C. Romero - cross

1  Q.  And how much, what percent, out of a hundred, in cash and
2  credit?
3  A.  At -- what are you referring to?
4          THE INTERPRETER:  I need a consult.
5          Seamless, are you referring to Seamless or are you
6  referring to cash and credit?
7          MS. KAFEDJIAN:  I'm referring to cash and credit.
8  A.  I, as I said before, I can't put an exact figure to it
9  because there were times when there was nothing.
10 Q.  But you do agree that cash and credit was a greater
11 percentage of tips than Seamless?
12         MR. CLARK:  Objection.
13         THE COURT:  Sustained.  He said he wasn't tipped on
14 Seamless.  Are you saying whether cash and credit was a greater
15 portion of the deliveries he made?
16         MS. KAFEDJIAN:  Yes.  Let me rephrase the question.
17 Q.  But you do agree that cash and credit was a greater portion
18 of the deliveries you made?
19 A.  I don't understand you clearly.  I don't quite understand
20 what you're saying.  But I do know that there wasn't much that
21 came as a result of cash and credit.  Most of it came from
22 Seamless.
23 Q.  OK.  Did the delivery workers pool their tips?
24 A.  Yes.  At the end of the night whatever we had received we
25 pooled.

F7RAROM3ps                        C. Romero - cross

1   Q.  How do you know the majority of your tips came from

2   Seamless if you never received your Seamless tips?

3           MR. CLARK:  Objection.  I don't think that was his

4   testimony.

5           MS. KAFEDJIAN:  He stated that.

6           THE COURT:  When you made a delivery, how did you know

7   that the order had been made on Seamless?

8           THE WITNESS:  Because the receipt for the order showed

9   how much had to be -- when the orders came in, the receipt

10  showed how much the order -- how much of an order had to be

11  paid, what the pay was for the order, on the receipt.

12          THE COURT:  Did you collect money from the customer

13  when there was a Seamless order?

14          THE WITNESS:  No, nothing like that.  Nothing like

15  that.  Because the payment is made through the Internet.  And

16  so I don't know anything about that.

17          THE COURT:  What percent of the deliveries that you

18  made were Seamless orders?

19  A.  I don't know exactly.  But normally -- I don't know, but

20  normally the Seamless orders were for clients that were asking

21  for a large amount of food, and -- but I don't know how many

22  were Seamless.

23  Q.  You have no way to determine whether an order is from

24  Seamless by looking at the receipt you have in your hand,

25  correct?

1    A.  Yes.  Yes, because on the top of it it says "Seamless."

2    Q.  So you know how many Seamless orders you're getting.

3    A.  I don't know how many, but I know that there are a lot of

4    them.

5              THE COURT:  When you said that typically a Seamless

6    order had a -- the customer generally paid more when they were

7    ordering on Seamless; is that what you're saying?

8              THE WITNESS:  Normally, yes.  Because normally they

9    are larger orders that are placed with Seamless.

10             THE COURT:  So you looked at the Seamless receipts,

11   correct?

12             THE WITNESS:  Yes.

13             THE COURT:  So if you were making a delivery where all

14   of the orders totaled $200, what portion typically would be a

15   Seamless order?

16             THE WITNESS:  I don't understand exactly what you're

17   referring to.  If it's 200 -- $200 exactly for what?

18             THE COURT:  OK.  So let's say that you have to make a

19   delivery.  You're going to three apartments.  Each receipt is

20   going to be probably for a different amount.  Right?

21             THE WITNESS:  Yes, it would be like that.

22             THE COURT:  So you said that when the orders were

23   Seamless, they would be higher in the quantity of money than

24   the other kinds of orders.  Is that right?

25             THE WITNESS:  Yes, that's right.

F7RAROM3ps                         C. Romero - cross

1           THE COURT:  And that's because the Seamless orders,

2     they ordered more food.  Is that right?

3           THE WITNESS:  Yes.

4           THE COURT:  And on the Seamless orders, you said you

5     received no tips.

6           THE WITNESS:  Yes.  Yes, that's exactly what I said.

7     I never received any tips from Seamless.

8           THE COURT:  But you knew how much the Seamless order

9     was.  You could read the receipt.  Is that correct?

10          THE WITNESS:  Yes, that's right.

11          THE COURT:  So if you made a delivery to three

12    different apartments, typically how much would the Seamless

13    order be?

14          THE WITNESS:  Well, the receipt said it's $3 or $5,

15    depending on how much they had ordered.

16          THE COURT:  I'm trying to understand, if you make a

17    delivery and one delivery, $25, another delivery of $50, and

18    then there's one more $100, you know that the total amount that

19    you deliver is $175, but that's rounding.  Do you understand

20    what I'm saying?

21          THE WITNESS:  Yes.

22          THE COURT:  And so I'm trying to understand,

23    typically, how much of the total could you attribute to the

24    Seamless order?

25          THE WITNESS:  You want to know how much money in tips?

1          THE COURT:  No.  I want to know the amount of the

2     orders.

3          THE WITNESS:  Well, the amount of the order, total

4     amount of the order would be the amount of the order as

5     represented on the receipt.

6          THE COURT:  You may continue.

7          MS. KAFEDJIAN:  OK.

8     Q.  Did the delivery workers pool their tips?

9     A.  Only that which was derived from cash and credit payments.

10    Q.  And how were those cash and credit tips pooled?

11    A.  At the end of the night, we put together, pooled, what we

12    had earned -- what we had received, rather, and we withdrew our

13    tips from that.

14         THE COURT:  On a typical night, how much money -- how

15    much was the total amount of the orders?  I'm not talking about

16    the tips, but the typical amount of the order, in dollars.

17         THE WITNESS:  It varied between 60 and 70 dollars,

18    sometimes more, sometimes less.

19         THE COURT:  I'm talking about a total of all of the

20    orders, including Seamless.

21         THE WITNESS:  I don't know on a typical night exactly.

22         THE COURT:  I'm not asking how much the tips were.

23         THE WITNESS:  The truth is, I don't have any idea.

24    Because it varied from day to day.  And we never actually paid

25    attention to that.

F7RAROM3ps                    C. Romero - cross

1    Q.  Were the tips pooled in equal shares?

2    A.  Yes.  Everything that was cash or credit, yes.

3    Q.  So you split it three ways?

4    A.  Among the delivery boys, yes.

5    Q.  And you testified earlier that you did minimum 20 to 25

6    deliveries a day?  Is that correct?

7    A.  Like I said, it varies, but normally if we did that,

8    sometimes we did more, sometimes less.

9    Q.  The reason I ask is, when a delivery worker came for only

10   lunch or only dinner, did he get equal shares of the tips?

11   A.  I don't understand very well.

12   Q.  Let say one of the delivery workers only came for dinner.

13   When you pooled your cash and credit-card tips at the end of

14   the night, did you still split it equally?

15   A.  Yes.

16   Q.  OK.  So if each of the three delivery boys were doing

17   minimum to 25 to 30 deliveries a day, there were 90 deliveries

18   being made on average a day; is that correct?

19   A.  Sometimes we did, yes.

20   Q.  OK.  Now, how were you paid?

21   A.  I got wages.  I got a salary.

22   Q.  Was it in cash?

23   A.  Yes.

24   Q.  Weekly?

25   A.  Yes.

1    Q.  What day of the week?

2    A.  It was Thursdays.

3    Q.  And when you went to collect your wages, where did you go?

4    A.  We didn't go anywhere.  The owner paid us over there in the

5    kitchen.

6    Q.  So you got paid in the kitchen every time?

7    A.  Yes, to the people in the kitchen and to us, yes.

8    Q.  And so all the employees were paid at the same time.

9    A.  No.

10   Q.  Oh.  So the kitchen staff was paid at the same time as the

11   delivery workers?

12   A.  Well, you have to take into consideration that if we were

13   making a delivery, then we wouldn't be there, but generally we

14   were paid in the kitchen.

15   Q.  So what I'm trying to understand is, who was paid at that

16   time, generally?  Was it the kitchen staff and delivery workers

17   or just the delivery workers?

18   A.  At that moment, all the personnel, everybody was paid at

19   that time.

20   Q.  Everyone was paid at the same time.

21   A.  Yes.  Well, not at the same time.  As I was saying, we were

22   outside.  As soon as we came in, then we got paid.

23   Q.  OK.  But if you happened to be there and you weren't on a

24   delivery, there was a group of people being paid at the same

25   time.

F7RAROM3ps                         C. Romero - cross

1   A.  Well, we were being paid one by one.

2   Q.  In the kitchen, by Mr. Sharma, the gentleman to my right

3   here?

4   A.  Yes.  The gentleman is the one who paid, yes.

5   Q.  And when you went one by one to receive payment, did all

6   the employees have to sign a receipt?

7   A.  Yes.

8   Q.  About how many employees were there?

9   A.  The ones who were working there, the ones in the kitchen,

10  and the delivery boys.

11  Q.  About how many people is that?

12  A.  Well, I have no idea, because we were not paid all at once,

13  at the same time.  It was one by one.

14  Q.  Yes, but you work in the restaurant, right?  Do you know

15  how many people worked in the restaurant?

16  A.  Well, the three cooks, the kitchen helper, the dishwasher,

17  and the delivery people, and the one who takes out the food.

18  Q.  What about the waiters?

19  A.  Regularly they were paid outside.

20  Q.  OK.  So the only ones that were paid inside were the

21  kitchen staff and the delivery workers.

22  A.  Regularly yes, it was that way.

23  Q.  And everyone had to sign a receipt to take their payment.

24  A.  That's what I saw.

25  Q.  OK.  Could you ever collect payment without signing?

1    A.  As far as I recall, no.

2    Q.  OK.  When you signed the page, did you see what was on it?

3    A.  No, nothing like that.

4    Q.  OK.

5         MS. KAFEDJIAN:  Your Honor, I'm going to hand the

6    witness what's been premarked as Plaintiff's Exhibit C -- oh,

7    I'm sorry, Defendant's Exhibit C.  Sorry.

8    Q.  Mr. Romero, are those the sheets that you signed on a

9    weekly basis?

10        THE INTERPRETER:  "Weekly basis," you said?

11   Q.  Weekly.

12   A.  Yes.  This is my signature, yes.

13   Q.  Now, when Mr. Sharma asked you to sign, was there any

14   writing on the page?

15   A.  Not where I signed.

16   Q.  Could you see the whole page?

17   A.  No, nothing like that, because he bent it this way and then

18   he didn't let you see what was in there.

19   Q.  So do you know if the page was blank or not?

20   A.  Well, the part that I was signing, yes, it was.  But then,

21   besides that, the owner didn't let us see the part, the part of

22   the page.

23   Q.  Did all the employees -- did Mr. Sharma, are you alleging

24   that Mr. Sharma covered part of the page for all of the

25   employees that were signing in the kitchen?

F7RAROM3ps                        C. Romero - cross

1   A.  Well, whenever I was signing, all the time, he always kept

2   the receipt.  He didn't hand it to me.  He didn't let us see

3   it.

4   Q.  Did he put it on the table for you to sign?

5   A.  No, nothing like that.

6   Q.  So you signed it -- how did you sign it, then?

7   A.  He had it in his hand and we just signed it.

8   Q.  So if he held it in his hand, how did he cover the page?

9   A.  He covered it that way.  And we only signed this part.

10          THE COURT:  OK.  So the witness --

11  A.  And we didn't see anything.

12          THE COURT:    -- is demonstrating with two different

13  sheets of paper.  The top sheet, he is holding the bottom half

14  up, and the lower sheet he is pointing to.  And so the top half

15  of the lower sheet is covered by the top half of the top sheet.

16  Q.  And when he covered the sheet in the manner that you're

17  claiming, did he hold it like this?

18  A.  No.  He picked it up this way, and then we signed the one

19  that was -- the lower -- the under one.

20  Q.  So he put the notebook on a table.

21  A.  No.  No.  He did not place it on the table.  We signed it

22  while he held it in his hand.

23  Q.  OK.  So he held it with one hand, covering the page, and he

24  used the other hand to hold the book and used this hand to

25  cover, and gave you a blank piece to sign?

F7RAROM3ps                         C. Romero - cross

1    A.  Well, we only signed on the blank portion, because he

2    actually holded the pages.

3    Q.  OK.  Could you turn to the Exhibit C that you have in front

4    of you to the pay period of December 3, 2012, which is a couple

5    pages in, four pages in.

6    A.  I don't know which one it might be.

7    Q.  Fourth page.  Go to the fourth page.  Does it say 12/3/12?

8    A.  Yes.  Is it this one?

9    Q.  Is that your signature on the page?

10   A.  Yes, it is mine.

11   Q.  Is your signature over the numbers that are written on that

12   page?

13   A.  Yes, but I never saw any numbers when I signed.

14   Q.  So at no point, are you claiming at no point when you

15   signed did you sign over any writing?

16   A.  No.  I never signed any paper where there were any numbers.

17   Q.  So what did you think you were signing?

18   A.  As I was saying, he just covered the receipts and he just

19   made us sign at the bottom.  That's all.

20   Q.  But what did you think that signature was for?

21   A.  Well, I didn't, you know, think anything.  I thought just

22   that he wanted to confirm that he was paying me.

23   Q.  If he wanted to confirm that he was paying you, wouldn't

24   you also believe that there should be a number on that page?

25             THE COURT:  All right, counsel.  Here we go again.

F7RAROM3ps                          C. Romero - cross

1          MS. KAFEDJIAN:  I apologize.

2          THE COURT:  Here we go again.

3          MS. KAFEDJIAN:  I apologize.

4   Q.  Did you ever have an opportunity in the five years that you

5   worked there, getting paid every week, to see whether the whole

6   page was blank or not?

7   A.  No, never, because he never put on the table anything that

8   we were signing or anything like that.  We signed it at all

9   times when he was holding it in his hand.

10  Q.  Was this the same for all the kitchen staff as well?

11  A.  As far as I could see, when people were signing, yes.

12  Q.  So none -- none of the other kitchen staff saw -- all the

13  kitchen staff, when they were presented also for payment, had

14  the paper folded over so they couldn't see whether or not any

15  numbers were written there?

16  A.  Yes, that's right.

17  Q.  So delivery boys and kitchen staff, to your knowledge, had

18  papers folded over every week when they signed.

19  A.  Yes.  That's what I saw whenever people were signing.

20  That's what I saw.

21  Q.  But you never saw any of the waiters receive their pay?

22  A.  Well, I never saw them receiving it, but then I saw them

23  sometimes signing, yes.

24  Q.  So did the waiters sign in the same way as the delivery

25  boys and the kitchen staff?

F7RAROM3ps                          C. Romero - cross

1    A.  They were the same book, or little notebook that he was

2    carrying, yes.

3    Q.  Did you see Mr. Sharma cover the pages for the waiters as

4    well when they signed to receive their pay?

5    A.  As I was saying is, I, you know, when I saw him doing this

6    for people to sign, he did it the same way, folded the page,

7    but, you know, he paid the waiters outside, so I don't know.

8    Q.  What I'm trying to get at here is, he folded the page for

9    everyone.  That's what you're alleging.  Correct?

10   A.  Yes, that's right.

11   Q.  And you saw this with your own eyes.

12   A.  Yes, with my own eyes, yes.

13   Q.  OK.  Mr. Romero, were you paid by the hour?

14   A.  I never heard the -- or was told that I was going to be

15   paid per hour.  I just got my salary.

16   Q.  OK.  Did you sign in, in the morning when you came in?

17   A.  For a while, but at the beginning when he came, or I

18   started at the job, we did not -- I did not.

19   Q.  So when did you begin punching in on the computer system?

20   A.  Well, I don't know exactly, but one and a half years.

21   Q.  Did you sign out?

22   A.  Yes, to -- when I arrived and when I left, for everything.

23   Q.  How did you sign out?

24   A.  We were given a number.  We just put it into the computer.

25   And that was all.

F7RAROM3ps                     C. Romero - cross

1  Q.  OK.  What about the days when you took off or only came for

2  lunch and dinner?  Were you paid the same rate?

3  A.  No, no.

4  Q.  Were you paid less?

5  A.  No.

6  Q.  So it has to be less or more?

7  A.  I didn't really understand your question.

8  Q.  On a day that you didn't show up for work, did you get

9  paid?

10 A.  The day that I would not show up for work would be my off

11 day, and then, no, I wasn't paid.

12 Q.  What if you took an extra day off?  Were you paid for that

13 day?

14 A.  No.

15 Q.  Let's say there was a week where you took off for either

16 lunch or dinner, didn't work the whole shift.  Did you get paid

17 the same?

18 A.  Yes.  Sometimes if I left, yes, I was paid the same.

19 Q.  So sometimes, even though you left early, you were paid the

20 same.

21 A.  Yes.

22 Q.  What if you worked more?  Let's say you worked seven days

23 that week.  Did you earn more money?

24 A.  If I worked my day off, yes, I was paid.

25 Q.  OK.  Did you regularly just come to work for lunch or

F7RAROM3ps                         C. Romero - cross

1    dinner, or did you just take the day off?

2              THE INTERPRETER:  Could you please repeat the question

3    for the interpreter?  Sorry.

4              MR. CLARK:  Objection.

5              THE COURT:  Sustained.

6    Q.  How often did you only come for half a shift?

7              THE INTERPRETER:  How often?

8    Q.  How often did you only come for half a shift for either

9    lunch or dinner?

10   A.  What do you mean?  If I only came for one shift?  I don't

11   understand.

12   Q.  Right.  So you worked there almost for five years.  How

13   often did you only come to work for lunch or dinner?

14   A.  As far as I know I worked every day.  Well, if I was late,

15   after I was late, then supposedly I would talk to Kiran --

16             THE COURT:  Chef.

17   A.  The chef.

18             THE INTERPRETER:  Thank you.  Thank you, your Honor.

19   Q.  Were there any days that you only came for the lunch shift

20   and left early or came to the dinner shift and came late?

21   A.  Well, sometimes, you know, no we -- it's not that we would

22   leave early, but, you know, if we finished and we have

23   something to do, then yes, or something, we would leave after

24   dinner.  But it was not all the time.

25   Q.  So sometimes you left early but still got paid the same.

F7RAROM3ps                      C. Romero - cross

1    Correct?

2    A.  Well, what you are referring to as leaving early is not

3    really leaving early, because what we did is finish the work

4    and then that was it.  Then what we had to do was clean.

5    Q.  Again let me ask you.  Did you ever come to work just to

6    work the dinner shift; you skipped the lunch shift?

7    A.  No, no.  I always came for the entire shift.

8    Q.  Did you ever take days off?

9    A.  Yes.

10   Q.  OK.  So during your five years of employment, you sometimes

11   took days off, but you did not ever come for half a shift.

12   A.  As far as I recall, no.

13           MS. KAFEDJIAN:  Your Honor, for this portion of the

14   questioning I have selected portions of Exhibit A, that's been

15   premarked as Exhibit A, since there is a language barrier and

16   not to have him flipping back and forth.  I've taken one of the

17   time sheets and one copy.  So these are selected excerpts from

18   Defendant's Exhibits A and C, matching weeks.

19   Q.  Now, Mr. Romero, what's the highest salary you received

20   while you were working at Amma?

21   A.  Well, I will, you know, depends about the time that you are

22   asking about, because it just depended, you know, the salary

23   changed.

24   Q.  What's the highest salary you claim to have been paid?

25   A.  $525.

F7RAROM3ps                          C. Romero - cross

1   Q.  OK.  And if you take a look at the first sheet in the

2   package I gave you, it corresponds with the week of August 5,

3   2013, is your name on that attendance sheet?

4   A.  Yes.

5   Q.  Does this attendance sheet show that you took three days

6   off that week?

7   A.  I don't remember that.

8   Q.  OK.  If you turn to the second page, the signed pay

9   statement, same period of August 5, 2013, is that your

10  signature?

11  A.  Yes.  This one is my signature, yes.

12  Q.  Does this statement show that you received $350 that week,

13  in base salary plus tips?

14  A.  As I was saying, I never ever saw the numbers when I

15  signed.

16  Q.  Was there ever a week when you took three days off?

17  A.  As far as I recall, no.  And whenever I actually missed

18  work for three days I wasn't paid for those three days.

19  Q.  Does it show that you were paid for those three days or

20  does it show that you were given a reduced payment?

21          THE COURT:  Counsel, are you expecting that this

22  document is going to be introduced through another witness?

23          MS. KAFEDJIAN:  No.

24          THE COURT:  He should not be reading from a document

25  that's not in evidence.  I don't know how much more I can

F7RAROM3ps                          C. Romero - cross

1    explain to you about the rules of evidence.

2              MS. KAFEDJIAN:  Well, the witness has claimed that he

3    was only paid a flat rate.  These four pay statements from four

4    different weeks show that he received various rate, and his

5    signature is on the pages.

6              MR. CLARK:  Your Honor, I don't believe that's what

7    this shows.  And I am thinking that this is not an attempt to

8    build up to an admission of any of these documents.  I don't

9    see how they functionally impeach anything he has been

10   testifying to.

11             MS. KAFEDJIAN:  What I'm trying to get his admission

12   is that on days that he did take off from work varying hours,

13   it was different payments.  It wasn't always the 525.

14             MR. CLARK:  In paragraph 20 of his direct affidavit,

15   he does note that the only change would be, "If I worked fewer

16   days than usual, in which case my weekly pay would be reduced."

17             MS. KAFEDJIAN:  Exactly.  But he contradicted that.

18             MR. CLARK:  I don't think that's what I heard.

19             MS. KAFEDJIAN:  He has claimed that he never took

20   three days off in one week.  He claims that he never worked

21   half a shift.  And these time sheets show different.

22             THE COURT:  You're showing him a document that he did

23   not create.

24             MS. KAFEDJIAN:  But his signature is on the second

25   pages.

F7RAROM3ps                          C. Romero - cross

 1              THE COURT:  You're saying that these short little

 2     slips somehow correspond to this larger chart?

 3              MS. KAFEDJIAN:  Well, it's for the same week.

 4              THE COURT:  All right.  Well, you need to put on the

 5     stand a witness who can explain this to me, because it is of no

 6     value.  It is just markings on a page.

 7     Q.  Did you ever receive more than $525 in any week that you

 8     worked?

 9     A.  No, because I didn't regularly work seven days.

10     Q.  I'm sorry.  Can you repeat that?

11     A.  I never received more than that because I never worked

12     seven days.

13     Q.  OK.  So you believe that the only time you earned more than

14     $525 was if you worked the seventh day.

15     A.  If I had worked seven days, then I would have been paid for

16     that day that I worked.

17     Q.  Did you have any lunch or dinner at the restaurant?

18     A.  Yes.  We ate any way we could.

19     Q.  But did you eat food prepared at the restaurant?

20     A.  Yes.

21     Q.  Lunch and dinner?

22     A.  We were given two meals.

23     Q.  On a regular basis.

24     A.  Yes.  That's the regular thing they do, they did.

25     Q.  So all the delivery workers were given lunch and dinner.

F7RAROM3ps

1  A.  Yes, that's right.

2  Q.  During your employment, did you see any notices posted in

3  the kitchen?

4  A.  I mean, I don't understand what.  Published?  Posted?

5  Q.  Were there any notices in the kitchen that talked about

6  wages, labor laws?

7  A.  At the beginning, no, I didn't see anything like that.

8  Q.  Are you saying that you saw it later?

9  A.  Yes.  Later on I was able to see certain notices.

10  Q.  And did you ever read those notices?

11  A.  No.

12  Q.  Were they written in English and Spanish?

13  A.  Truth is, I never really attributed -- gave them that much

14  importance.

15       MS. KAFEDJIAN:  One moment, your Honor.

16       No further questions.

17       MR. CLARK:  If I could just have a moment to confer

18  with counsel.

19       THE COURT:  Yes.

20       (Pause)

21       MR. CLARK:  We have no further questions for the

22  witness.

23       THE COURT:  All right.  You may step down.

24       (Witness excused)

25       THE WITNESS:  Thank you.

F7RAROM3ps

1          THE COURT:  So Ms. Kafedjian, I'm the trier of fact,

2     and all of the evidence that you're giving us is being used to

3     persuade me of some fact or another.  And so giving the witness

4     a piece of paper and I have no information whatsoever about it

5     and all he says is, yes, I signed that, and you don't expect to

6     introduce that through another witness, of what probative value

7     is that piece of paper?

8          MS. KAFEDJIAN:  He testified that he did see the

9     paper, that he did know what was in it.  There's no way for me

10    to know, to assume the testimony before --

11         THE COURT:  So you're saying that a document that he

12    did not create, he's suddenly supposed to understand its

13    import?  This is absurd.

14         MS. KAFEDJIAN:  These are documents that he signed.

15    Whether he saw the paper or not, it's a critical issue.  There

16    is no other way that we could cross-examine about that, without

17    showing him and asking him --

18         THE COURT:  The question is, if you're using this for

19    impeachment, it must have some meaning.  This chart has no

20    meaning to me whatsoever.  You've given no foundational

21    evidence for this.  This sheet of paper, he says, does have his

22    signature on it.  Well, you can ask him about that.  But you're

23    asking him about this, that he says he never saw.

24         This is absolutely the worst direct examination I have

25    seen in my entire career since I've graduated law school.  The

1    worst.

2              Please call your next witness.

3              MR. ANDROPHY:  Plaintiffs call Juan Romero.

4     JUAN ROMERO,

5        a plaintiff herein, having been duly sworn through the

6     interpreter, testified as follows:

7              MR. ANDROPHY:  May I approach the witness?

8              THE COURT:  Is there a question?

9              MR. ANDROPHY:  Just one.

10             THE COURT:  Yes.  You may be seated.

11    DIRECT EXAMINATION

12    BY MR. ANDROPHY:

13    Q.  Mr. Romero, do you recognize the document I just handed up

14    to you that is marked Plaintiff's Exhibit 12?

15    A.  Yes.  This is my testimony, yes.

16    Q.  And you can turn to the last page of that document.  Is

17    that your signature?

18    A.  Yes, that's my signature.

19             MR. ANDROPHY:  I ask that that declaration be admitted

20    as Plaintiff's Exhibit 12 and be admitted as Mr. Juan Romero's

21    direct testimony.

22             THE COURT:  Any objection?

23             MS. KAFEDJIAN:  No objection.

24             THE COURT:  It will be admitted as Exhibit No. what?

25             MR. ANDROPHY:  12.

F7RAROM3ps                          J. Romero - cross

1             THE COURT:  No. 12 is admitted.

2             (Plaintiff's Exhibit 12 received in evidence)

3             THE COURT:  You may inquire, cross-examination.

4    CROSS EXAMINATION

5    BY MS. KAFEDJIAN:

6    Q.  Mr. Romero, when did you begin working for Amma?

7    A.  In 2008.

8    Q.  2008?

9    A.  Yes.

10   Q.  And when did you leave Amma?

11   A.  In 2012.

12   Q.  How did you hear about the job?

13   A.  Through my brother.

14            THE COURT:  One moment, please.

15            (Pause)

16            THE COURT:  You may continue.

17            MR. ANDROPHY:  Your Honor, I see there is, I guess,

18   two people in the back.  I don't know if they are non-party

19   witness, but if they are, I ask that they be excused.

20            THE COURT:  I know that the gentleman on the right is

21   not because he is one of my law clerks.  But the person to my

22   left in the back, are you a witness in this trial?

23            A VOICE:  No.

24            MR. ANDROPHY:  OK.

25   BY MS. KAFEDJIAN:

F7RAROM3ps                    J. Romero - cross

1   Q.  And what was your position at Amma?

2   A.  Deliver food.

3   Q.  Did you ever a bike to deliver food?

4   A.  Yes.

5   Q.  Were you required by your boss to buy a bike?

6   A.  Yes.  I had to buy the bike at my expense.

7   Q.  Were you specifically told you had to?

8   A.  Yes.

9   Q.  Who told you?

10  A.  This was ordered by the owners, but it was translated to me

11  by an individual.

12  Q.  Were there any delivery workers who didn't have bikes?

13  A.  No.  All of us had bicycles.

14  Q.  How many bikes did you have to purchase during the length

15  of your employment, your job?

16        THE COURT:  Why did you buy more than one?

17        THE WITNESS:  I don't remember exactly, but I had

18  several bikes.  I had bought between five and six bikes.  What

19  happened was, one of them broke down and some of them were

20  robbed.

21  Q.  And when you purchased these bikes, did you keep a receipt?

22  A.  The truth is, I do not have them any longer.

23  Q.  Do you have any receipts for any of the bikes or other

24  equipment you alleged to have purchased?

25  A.  No, not any longer.

1    Q.  How many days a week did you work?

2    A.  Six days.

3    Q.  And how long were your shifts?

4    A.  You mean from what time to what time?

5    Q.  Yes.

6    A.  From 11 to 11, but at times I worked until 11:30, 12,

7    12:30.

8    Q.  When you say "at times," was this every day?

9    A.  Most of them, yes.

10   Q.  Did the other employees have to stay that late as well?

11   A.  Yes.  They stayed as well.

12   Q.  Which other employees?

13   A.  My fellow workers that delivered the food with me.

14   Q.  What about the other employees?  What about the kitchen

15   staff?

16   A.  They went.  They left.

17   Q.  What about the wait staff?

18   A.  What do you mean by "the waiters"?

19   Q.  Did the waiters stay until 11:30, 12, as you're claiming?

20   A.  They left as well.

21   Q.  So the only people that remained at the end of the shift

22   were the delivery boys?

23   A.  Yes.  And the dishwasher.

24   Q.  Were there three delivery boys?

25   A.  Yes.  The three delivery boys, a kitchen assistant, and the

F7RAROM3ps                    J. Romero - cross

1  dishwasher were those of us who remained.

2  Q.  And what was the name of the kitchen assistant?  What was

3  the name of the kitchen assistant?

4  A.  Cesar.

5  Q.  So five employees remained, and all five of you cleaned the

6  restaurant at the end of the shift?

7         THE INTERPRETER:  I'm sorry.  Would you repeat the

8  question?

9  Q.  Five employees remained, and are you alleging that all five

10  of you cleaned the restaurant at the end of the shift?

11  A.  Yes.  But there were only four of us.

12  Q.  The dishwasher left?

13  A.  Yes.  Yes.  Upon finishing his work, he would leave.  He

14  left before we did.

15  Q.  And what time would the four of you leave, typically?

16  A.  Generally when we were finished working at 12, 12:30.  It

17  depended on what we had to clean.

18  Q.  Was there any manager there watching you?

19  A.  Yes, the person who closed up.

20  Q.  Which is who?

21  A.  Generally the person that closed up was named Salvador.

22  Q.  Do you know who Kiran is?  Kiran.

23  A.  Another individual who works there.

24  Q.  Did he ever close up?

25  A.  Yes, on occasion he closed up, but generally the person

F7RAROM3ps                      J. Romero - cross

1   that closed up was Salvador.

2   Q.  How many days a week would Kiran close up?

3   A.  Truth is that I don't remember exactly.  I would say about

4   once or two times, but generally the person who closed up and

5   the only person that spoke Spanish because he translated, he

6   could understand the owners.  He told us what to do.  He told

7   us when to clean and the rest of everything that we had to do.

8   Q.  So you're saying Kiran closed up once or twice a week?  Is

9   that what you're saying?

10  A.  Yes.  He closed up also.

11  Q.  Once or twice a week?  Or more?

12  A.  Something like that.  But generally the person that closed

13  was Salvador.

14  Q.  When Kiran did close up --

15          THE COURT:  One moment.

16          (Pause)

17          THE COURT:  You may continue.

18  BY MS. KAFEDJIAN:

19  Q.  On the next day, Kiran would close the restaurant.  Did he

20  stay with you on the floor in between?

21  A.  Yes.

22  Q.  And what would he do at that time?

23  A.  He stayed in the dining room, the table dining room.

24  Q.  And on the nights when Kiran would lock up and close, what

25  time did you leave the restaurant?

F7RAROM3ps                          J. Romero - cross

1          THE INTERPRETER:  I'm sorry, your Honor.  I don't know

2     if it's the acoustics or what.  I'm an experienced simultaneous

3     interpreter.  But counsel, it's so fuzzy that I can't hear,

4     unless I stop talking.  I'm not blaming counsel for that.

5     Maybe it's the acoustics or something.

6          THE COURT:  What about if you speak closer to the

7     mike.

8          THE INTERPRETER:  That might help.  If you can

9     maintain a fairly consistently loud --

10          MS. KAFEDJIAN:  I'll try.

11    Q.  On the nights that Kiran --

12          THE COURT:  You could also ask your questions from the

13    desk, if you prefer that?  I don't know if it's going to help.

14          THE INTERPRETER:  As long as you have the microphone

15    and speak sufficiently loud so that I can speak --

16    Q.  On the nights that Kiran closed the restaurant, what time

17    would the four of you leave, at the end of that shift?

18    A.  That depended on the hour when we actually finished.

19    11:45, or up until 12.

20    Q.  So on the nights that Kiran would close the restaurant, the

21    latest you left was 12?

22    A.  Yes.

23    Q.  What about the nights that Salvador would close?

24    A.  He also would stay with us for those extra hours, until

25    later sometimes.

F7RAROM3ps                         J. Romero - cross

1  Q.  So what's the latest he would stay when Salvador would

2  close?

3  A.  That would have been about two times a month, because we

4  had to clean up almost the entire kitchen, the basement, the

5  hood over the oven, the refrigerators on the outside and on the

6  inside as well.

7  Q.  So the only time Salvador closed was two times a month?

8  A.  No.  He was the one that closed almost all -- the entire

9  week.

10  Q.  So what I'm asking you is, on the nights which Salvador

11  would close, what's the latest you stayed?

12  A.  Until 12.

13  Q.  So if either Kiran or Salvador closed, the latest you ever

14  stayed was 12?

15  A.  Yes.

16  Q.  So you never worked past 12.

17  A.  Well, yes, we did work later than --

18  Q.  So I'm asking you, what's the latest you worked?

19  A.  On those two occasions when we remained to clean up

20  everything.

21  Q.  So you're talking --

22          THE COURT:  What time did you leave on those

23  occasions?

24          THE WITNESS:  That depended on us.  Around 1, 1:30, or

25  2 it o'clock.  It depended on how we did our work.

F7RAROM3ps                    J. Romero - cross

1   Q.  So on those occasions where you stayed until 2 a.m. at the

2   restaurant cleaning, who closed the restaurant?

3   A.  The guy that did the translation, Salvador.

4   Q.  And what did Salvador do until 2 in the morning, when you

5   were cleaning?

6   A.  He simply waited for us in the dining room, waiting for us

7   to finish, so that he could -- so that we could go, and so that

8   he could close up.

9   Q.  So he waited in the dining room for two, three hours?

10  A.  Yes.  He waited there.

11  Q.  So he didn't leave and come back to close up.

12  A.  No.  No, he didn't leave.

13          THE COURT:  Did you have an opportunity to see what he

14  was doing in the dining room?

15          THE WITNESS:  Yeah.  He would be reading the

16  newspapers, speaking with somebody.

17          THE COURT:  So did you have the feeling that he was

18  working, or relaxing?

19          THE WITNESS:  He was simply relaxing while we finished

20  up work, waiting until he could check on our work.

21  Q.  While you were working, did he give you any instruction on

22  what should be cleaned?

23  A.  No, because we already knew everything we had to do.

24          THE COURT:  One moment, please.

25          (Pause)

F7RAROM3ps                    J. Romero - cross

1          THE COURT:  You may continue.

2  Q.  So Salvador would sit in the dining room and relax.  Did he

3  give you any instructions?

4  A.  No, because we already knew what we had to do.

5  Q.  And you're saying that twice a week -- twice a month, I'm

6  sorry -- you stayed until 2 in the morning, performing this

7  intensive cleaning.

8  A.  Yes.

9  Q.  Did you know if the defendants hired professional cleaners

10 to clean the kitchen at any point?

11 A.  No.  The all -- the whole time I was working over there,

12 nobody else came to do that but ourselves, you know, among the

13 delivery guys.

14 Q.  Take us through a typical workday.  What was the first

15 thing you did when you came to work?

16 A.  I had to sweep and mop the corridors.  I had to go mop the

17 corridor of the building.  I had to go outside to sweep the

18 sidewalk and to also water it down, to clean the bathroom.

19 Q.  And this you did all before lunch began at 12 o'clock?

20 A.  Yes.  I did it twice a day.

21 Q.  What time did you arrive at work?

22 A.  Well, the time I was supposed to be at work was 11.

23 Sometimes I was a little bit late because of traffic, but I

24 would be five minutes late.

25 Q.  So from about 11 or a little after until 12, your duties

F7RAROM3ps                          J. Romero - cross

1   were to clean the hallway, clean the sidewalk, and clean the

2   bathroom.

3   A.  Yes.

4   Q.  Did you do these jobs alone?

5   A.  Yes.

6   Q.  And you said you did them twice a day?

7   A.  Yes.

8   Q.  When was the second time you performed these two jobs?

9   A.  Supposedly when the restaurant was closed.

10  Q.  So that's after lunch?

11  A.  Yes.

12  Q.  So you clean the sidewalk twice a day.

13  A.  Yes.  As well as the bathroom and the corridor.

14  Q.  Did you do this every day?

15  A.  Most of the time every day.

16  Q.  Did your brother Carmelo ever clean the sidewalk?

17  A.  Yeah.  Sometimes, sometimes we -- he would do it, but, you

18  know of the time I did it because most of the time what he did

19  was clean in the dining room where the clients sit, eat, or

20  otherwise he would be in the kitchen helping the cooks, as long

21  as there were no deliveries that were ready to be taken out.

22  Q.  So was there a division of labor?  Were your duties to

23  clean the hallway, the sidewalk, and the bathroom twice a day?

24  A.  Yes.

25  Q.  Was it your brother's job to vacuum the dining room?

F7RAROM3ps                         J. Romero - cross

1    A.  Well, during the week we switched, but all the work had to

2    be done.

3    Q.  Who switched?

4    A.  You know, among the delivery guys we did.

5    Q.  So you rotated vacuuming the dining room?

6    A.  Yes.

7    Q.  Did you also rotate cleaning the bathroom?

8    A.  Yes also.

9    Q.  Did you rotate cleaning the sidewalk?

10   A.  Yes, and the corridor.

11   Q.  So then you didn't clean the sidewalk and the hallway and

12   the bathroom every day?

13   A.  But most of the time I had to do it.

14   Q.  So let me understand.  Were you rotating equally, or was it

15   your job?

16   A.  Most of the time I had to do it because as ours -- one of

17   the last persons -- I came up to them.  They had been there

18   already a few months longer than I had, so I had to do it.

19   That's why it was my task to do more those things.

20   Q.  And when you say it's your task to do more of these duties,

21   what percentage of the time did you perform these duties and

22   what percentage of the time did your brother perform them?

23   A.  Well, he would do it like once or twice a week, just to say

24   like that.  But most of the time I did it.

25   Q.  And what kinds of things we do once or twice a week?  Would

F7RAROM3ps                    J. Romero - cross

1   he clean the bathroom once or twice a week?

2   A.   Yes.

3   Q.   Would he clean the corridor once or twice a week?

4   A.   Yes.

5   Q.   Would he clean the sidewalk once or twice a week?

6   A.   Yes, also.  But -- yes, yes.

7   Q.   Would he vacuum once or twice a week, the dining room?

8   A.   Yes.  Most of the time.  He did it frequently.  But most of

9   the work was distributed.

10         THE COURT:  What do you mean by that, "distributed"?

11         THE WITNESS:  Because what happens is that we were

12   three delivery guys.  So one person would be cleaning the

13   dining room where the clients are eating, another one was doing

14   the bathroom or the corridor, and the other one would be

15   already helping the cooks.

16         THE COURT:  And was this the exception, or was this

17   what happened normally?

18         THE WITNESS:  That was practically every day.

19   Q.   And at all the times you were employed at Amma, were there

20   only three delivery workers?

21   A.   All the time that I was working there, we only had three

22   delivery guys, and when there was a lot of work, then the

23   kitchen helper would come in.

24   Q.   What was the name of the third delivery guy?

25   A.   His name was Gerardo.  It was Gerardo, my brother, and

F7RAROM3ps                      J. Romero - cross

1   myself.

2   Q.  Did you ever work with Nelson Murillo?

3   A.  No, I didn't work with him.

4   Q.  So the witness that was here earlier, you never worked with

5   him?

6   A.  No, I didn't have to work with him, no.  Because I think

7   when I left, that's when he came in.

8   Q.  OK.  So the three of you -- Gerardo, your brother, and

9   yourself -- rotated these duties of cleaning the bathroom,

10  vacuuming the dining room, cleaning the corridor, and cleaning

11  the sidewalk?

12  A.  Yes.

13  Q.  And you said you performed these duties twice a day, once

14  when the restaurant opened and once after it closed for lunch.

15  A.  I'm sorry?

16  Q.  You testified earlier -- correct me if I'm wrong -- that

17  you performed these duties twice a day.  Is that correct?

18  A.  Yes.

19  Q.  You performed it in the morning when you came, and also

20  after the restaurant closed after lunch.

21  A.  Yes.

22  Q.  Were there any other things that you had to do twice a day?

23  A.  I had to do that, and then the whole work that we had to do

24  during the day.  We had to help the cooks.  We had to work in

25  the basement.  We also had to go across the way to the offices

F7RAROM3ps                    J. Romero - cross

1   to clean, the two offices.  And over there I also clean the

2   bathrooms.  And then whatever utensils and things that were

3   dirty, because after they ate the owners left things that were

4   dirty there.

5   Q.  When you performed these tasks of cleaning the bathroom,

6   cleaning the corridor, cleaning the sidewalk, and/or vacuuming

7   the dining room, before lunch and after lunch, how long did

8   this rotation of duties take you?

9   A.  You mean cleaning in the morning?

10  Q.  Yes, the morning.

11  A.  It depended on how fast we were, because sometimes we were

12  told to hurry up because there were ready deliveries, or

13  deliveries that were ready.

14  Q.  Well, let me ask you this.  Did you have to have the dining

15  room and bathroom and corridor cleaned before customers came in

16  at 12 o'clock for lunch?

17  A.  Yes.

18  Q.  So did those jobs have to be completed at some time between

19  11 and 12?

20  A.  Yes.

21          THE COURT:  All right, then.  We're going to stop

22  here.

23          You may step down, sir.

24          (Witness excused)

25          THE COURT:  Counsel, I would like you to approach,

F7RAROM3ps                         J. Romero - cross

1   please.

2              (Discussion held off the record in the robing room)

3              THE COURT:  We are adjourned and will resume promptly

4   tomorrow at 9 a.m.

5              (Adjourned to 9:00 a.m., July 25, 2015)

6                         INDEX OF EXAMINATION

7   Examination of:                          Page

8   NELSON MURILLO

9   Direct By Mr. Clark . . . . . . . . . . . . . . .12

10  Cross By Ms. Kafedjian . . . . . . . . . . . .13

11  Cross By Ms. Kafedjian . . . . . . . . . . . .34

12  Redirect By Mr. Clark . . . . . . . . . . . .43

13  CARMELO ROMERO

14  Direct By Mr. Clark . . . . . . . . . . . . . .45

15  Cross By Ms. Kafedjian . . . . . . . . . . . .47

16  Cross By Ms. Kafedjian . . . . . . . . . . . .68

17  JUAN ROMERO

18  Direct By Mr. Androphy . . . . . . . . . . . 112

19  Cross By Ms. Kafedjian . . . . . . . . . . . 113

20                         PLAINTIFF EXHIBITS

21  Exhibit No.                              Received

22   10    . . . . . . . . . . . . . . . . . . .13
     11    . . . . . . . . . . . . . . . . . . .47
23   12    . . . . . . . . . . . . . . . . . . 113

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300